# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

*In re* McCREE

Docket No. 146826. Argued December 11, 2013 (Calendar No. 1). Decided March 26, 2014.

The Judicial Tenure Commission (JTC) petitioned for the interim suspension of Wayne Circuit Court Judge Wade H. McCree without pay. The Supreme Court granted the petition. 493 Mich 935 (2013). The JTC subsequently filed a formal complaint against respondent, alleging five counts of misconduct: that respondent had engaged in improper conduct in two criminal cases before him, falsely reported a felony, exhibited improper bench conduct and demeanor, and made misrepresentations to the JTC. The Supreme Court appointed retired Jackson Circuit Court Judge Charles A. Nelson to act as master. After a hearing, the master concluded that respondent had committed misconduct as alleged in Counts I through III of the complaint. With respect to Count I, the master concluded that respondent should have disqualified himself from a felony nonsupport case as soon as he began a sexual relationship with Geniene LaShay Mott, who was the complaining witness in the case. With respect to Count II, Judge Nelson found that respondent had lied to the prosecuting attorney's office when he reported that Mott was stalking him and trying to extort money from him. With respect to Count III, the master concluded that respondent had improperly acted in another criminal case, one that involved Mott's uncle. With respect to Count IV, the master found that although many of the text messages that respondent exchanged with Mott while he was on the bench were inappropriate, they were used in a private context and did not rise to the level of judicial misconduct. Finally, the master found that the misrepresentations alleged in Count V did not warrant action by the JTC. The JTC concluded that respondent had engaged in judicial misconduct and conduct prejudicial to the administration of justice as alleged in Counts I through III. With respect to Count V, the JTC did not adopt the master's findings and found instead that respondent had engaged in a pervasive pattern of dishonesty that included lying under oath to the commission and to the master. The JTC recommended that respondent be removed from office, conditionally suspended without pay for six years beginning on January 1, 2015 (with the suspension becoming effective only if he is reelected to judicial office in November 2014), and ordered to pay $11,645.17 in costs.

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justices KELLY, ZAHRA, McCORMACK, and VIVIANO, the Supreme Court *held*:

The cumulative effect of respondent's misconduct required his removal from judicial office and imposition of a conditional suspension.

1. The evidence established that respondent had a sexual relationship with a complaining witness in a case pending before him without recusing himself for several months and engaged in numerous ex parte communications with her concerning the case, as well as concerning another case in which her uncle was a party. Respondent violated various courthouse policies by permitting Mott to enter the facility through an employee entrance without going through security, allowing her to remain alone in his chambers while he was on the bench, arranging for her to park her vehicle in an area reserved for judges, and sneaking her cell phone into the courthouse for her. While he was on the bench, respondent sent Mott numerous text messages that contained inappropriate and derogatory references to defendants, litigants, and witnesses appearing before him. Respondent lied about when and why he finally did recuse himself from the case in which his mistress was the complaining witness and sought to use the prosecuting attorney's office as leverage against Mott by concocting the stalking and extortion charges. He also lied under oath during the JTC proceedings.

2. Respondent's actions constituted misconduct in office and conduct clearly prejudicial to the administration of justice within the meaning of Const 1963, art 6, § 30 and MCR 9.205. He violated MCR 9.104(1) through (4) by engaging in conduct prejudicial to the proper administration of justice; conduct that exposed the legal profession or the court to obloquy, contempt, censure, or reproach; conduct that was contrary to justice, ethics, honesty, or good morals; and conduct that violated the standards or rules of professional conduct adopted by the Supreme Court. Respondent violated MCR 2.003 by failing to disqualify himself in the criminal cases and violated MCL 750.423 by testifying falsely under oath. He violated Canon 1 of the Code of Judicial Conduct by failing to maintain high standards of conduct so that the integrity and independence of the judiciary may be preserved. He violated Canon 2 by failing to avoid all impropriety and appearance of impropriety, failing to promote public confidence in the integrity and impartiality of the judiciary, and allowing a social relationship to influence his judicial conduct or judgment. He violated Canon 3 by failing to be faithful to the law, engaging in ex parte communications, and failing to raise the issue of disqualification.

3. In *In re Brown*, 461 Mich 1291 (2000), the Supreme Court set forth seven considerations to guide the formation of judicial-discipline recommendations. The JTC properly concluded that six of the *Brown* factors weighed in favor of a more serious sanction. Removing respondent from office and conditionally suspending him without pay for six years beginning on January 1, 2015 (with the suspension becoming effective only if respondent is reelected to judicial office in November 2014) was necessary to sufficiently redress the harm done to the integrity and reputation of the judiciary. Lying under oath is entirely incompatible with judicial office and warrants removal, but respondent did far more than lie under oath and committed most of his misconduct while the JTC was investigating him for other misconduct for which he has since been sanctioned.

4. Const 1963, art 6, §§ 4 and 30 grant the Supreme Court authority to sanction a judge. Section 4 gives the Supreme Court general superintending authority over courts and the power to determine that a person is unfit for judicial office and prevent the person from exercising judicial power in this state for as long as the person is, in the Court's judgment, judicially unfit. Const 1963, art 6, § 30(2) authorizes removal and suspension as sanctions. The power to suspend is not limited to cases in which the judge currently holds office. The Supreme Court has constitutional

authority to issue conditional suspensions that foreclose the exercise of the prerogatives inhering in any judicial office to which the disciplined person might be elected or appointed in the future, the condition being reelection or appointment to judicial office. A conditional suspension disengages the disciplined person from judicial power only if the person occupies judicial office again during the term of the suspension and do not permanently enjoin the person from holding judicial office. The Supreme Court has issued conditional suspensions when other sanctions could not fully and adequately address the effect of particular misconduct on the integrity of the judicial system. In this case, removal of respondent alone would be an insufficient sanction. If he were to be reelected in 2014, his total period of suspension would be less than two years (including his interim suspension), which would be insufficient given the seriousness of his misconduct.

5.    Because respondent engaged in conduct involving deceit or intentional misrepresentation, he was ordered to pay the JTC costs of $11,645.17 under MCR 9.205(B).

Removal from office, conditional suspension, and payment of costs ordered.

Justice CAVANAGH, concurring in part and dissenting in part, agreed with the majority's factual findings and analysis of the factors from Brown, but disagreed with the decision to conditionally suspend respondent. Const 1963, art 6, § 30 provides four possible sanctions, allowing the Supreme Court to censure, suspend with or without salary, retire, or remove a judge. Removal is the most serious sanction and is, therefore, the means by which judges guilty of serious misconduct are divested of office. Because respondent's misconduct was of a grave and serious nature, Justice CAVANAGH agreed with removing respondent from office, but disagreed that removal alone would not sufficiently address the seriousness of respondent's conduct. The majority overlooked the fact that other institutions, such as the press, serve the public's interest in being informed and may be expected to do so in this case. In any event, the Supreme Court always retains the power to determine that a person is unfit for judicial office and prevent that person from exercising judicial power in this state for as long as he or she is in the Court's judgment judicially unfit.

©2014 State of Michigan

# Opinion

Chief Justice:    Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

FILED MARCH 26, 2014

STATE OF MICHIGAN

SUPREME COURT

*In re* WADE H. McCREE, Judge, Wayne      No. 146826
Circuit Court

BEFORE THE ENTIRE BENCH

MARKMAN, J.

The Judicial Tenure Commission (JTC) has recommended that respondent, Wayne Circuit Judge Wade H. McCree, be removed from office and conditionally suspended without pay for six years beginning on January 1, 2015-- with the suspension becoming effective only if respondent is reelected to judicial office in November 2014-- and that he be ordered to pay costs in the amount of $11,645.17. Respondent has filed a petition asking this Court to reject that recommendation. We affirm almost all of the JTC's factual findings and conclusions of law, and we adopt its recommendation. The evidence establishes that respondent (a) had a sexual relationship with a complaining witness in a case pending before him without recusing himself for several months, (b) engaged in numerous ex parte communications with her concerning the case, as well as concerning

another case in which one of her relatives was a party, (c) violated various policies of the courthouse by permitting his mistress to enter the facility through an employee entrance without going through security, allowing her to remain alone in his chambers while he was on the bench, arranging for her to park her vehicle in an area reserved for judges, and sneaking her cell phone into the courthouse for her, (d) transmitted numerous text messages to her while he was on the bench that contained inappropriate and derogatory references to defendants, litigants, and witnesses appearing before him, (e) lied about when and why he finally did recuse himself from the case in which his mistress was the complaining witness, (f) sought to use the prosecuting attorney's office as leverage against his then ex-mistress by concocting charges of stalking and extortion against her, and (g) lied under oath during the JTC proceedings. The cumulative effect of respondent's misconduct convinces this Court that respondent should not remain in judicial office, and we therefore remove him from office and conditionally suspend him without pay for six years beginning on January 1, 2015, with the suspension becoming effective only if respondent is reelected to judicial office in November 2014. In addition, because respondent engaged in conduct involving "deceit, or intentional misrepresentation," pursuant to MCR 9.205(B) we order respondent to pay costs of $11,645.17 to the JTC.

In respondent's words in his own defense, "Wade should have recused himself," but the failure to do so resulted in "no harm no foul." We disagree. The "harm" done was to the parties' rights to a fair legal process and the public's right to an impartial judiciary, and the "foul" committed was the resulting violation of Michigan's Code of Judicial Conduct.

2

## I. FACTS AND HISTORY

On January 7, 2013, pursuant to MCR 9.219(A)(2), the JTC filed a petition for the interim suspension without pay of respondent. By order of February 8, 2013, this Court granted the petition, effective immediately. *In re McCree*, 493 Mich 935 (2013).[1] On March 12, 2013, the JTC filed Formal Complaint No. 93 against respondent, alleging five counts of misconduct. It asserted that respondent had engaged in (a) "improper conduct [in] *People v King*" (Wayne Circuit Court Case No. 12-003141-01-FH); (b) the "false report of a felony"; (c) "improper conduct [in] *People v Tillman*" (Wayne Circuit Court Case No. 12-000686-01-FH); (d) "improper bench conduct and demeanor"; and (e) "misrepresentations to the Commission."

With regard to Count I, the complaint alleged that between May and November 2012, respondent had a sexual relationship with Geniene LaShay Mott, who was the complaining witness in *People v King*. Robert King, the father of one of Mott's children, was the defendant in that case, which pertained to his failure to pay Mott child support. Respondent and Mott repeatedly engaged in ex parte communications about the *King* case. For example, in response to Mott's texted suggestion to impose a jail sentence until King paid $2,500, respondent texted back:

> I figured if [he] hasn't come current by his courtdate, he gets jail 2 pay. If he says he can bring me the $$, I'll put him on a tether till he brings the receipt 2 FOC or do 'double time'.[2]

---

[1] This Court ordered "respondent's salary [to] be held in escrow pending the final resolution of these disciplinary proceedings." *McCree*, 493 Mich at 935.

[2] Presumably, "FOC" means "Friend of the Court."

Respondent asked Mott to keep their relationship confidential because of the then-pending JTC investigation regarding respondent's previous conduct of having texted a photograph of himself without a shirt to a female deputy sheriff and telling a reporter in response to questions about his actions that "there is no shame in my game."[3] For example, on June 20, 2012, respondent included the following in an email to Mott:

> My Judicial Tenure Commission matter has me nervous, as you might expect. I have to be real careful until this matter is put to rest. I can only ask humbly for your indulgence. Sorry. Second, you are the complaining witness on a case that is before me. Naturally if it got out that we were seeing each other before your B.D.'s[4] case closed, everybody could be in deep shit.[5]

Respondent did not transfer the *King* case to another judge until September 18, 2012, at which point respondent sent the following text message to Mott:

> DONE DEAL!!!!:-) I told a story so well, I had me believing it!! Brother King is on his way 2 'hangin' Judge [James A.] Callahan. He fuck up ONCE & he's through!![6]

With regard to Count II, the complaint alleged that respondent later made a false stalking/extortion complaint against Mott with the Wayne County Prosecuting Attorney's Office. He also falsely told the prosecutor's office that he had transferred the *King* case immediately upon starting his relationship with Mott and that Mott had demanded

---

[3] As a result of that JTC investigation, this Court adopted the JTC's recommendation to publicly censure respondent. *In re McCree*, 493 Mich 873 (2012).

[4] Presumably, "B.D." means "baby's daddy."

[5] This e-mail message demonstrates that respondent was clearly cognizant that he should have recused himself from the *King* case well before he did.

[6] This text message appears to suggest that respondent was untruthful about his reasons for recusing himself from the *King* case.

4

$10,000 in return for terminating her pregnancy and not revealing respondent's affair with her to respondent's wife.

With regard to Count III, the complaint alleged that respondent was involved in another failure-to-pay-child-support case in which Mott had an interest-- *People v Tillman*. The defendant in that case was a relative of Mott's. Respondent and Mott engaged in ex parte communications regarding this case as well. Off the record, and in the absence of any motion being filed, respondent signed an order for the reduction of bond relating to Mott's relative.

With regard to Count IV, the complaint alleged that respondent transmitted numerous text messages to Mott while he was on the bench. Many of these text messages contained inappropriate and sexually explicit comments. For example, respondent texted Mott:

> Oh yeah, I text from the bench. After last nite, its all I can do not 2 jerk off 'under' the bench:-). U know U have a magnificent pair of legs!

Numerous text messages respondent transmitted from the bench contained inappropriate and derogatory personal references to defendants, litigants, and witnesses appearing before him. For example, he texted:

> C'mon, U'r talking about the 'docket from Hell'; filled w/tatted up, overweight, half-ass English speaking, gap tooth skank hoes....and then U walk N.

He also texted:

> 2 funny, I just had Monica Conyers'[7] nephew B4 me (ignorant shit...as usual).

---

[7] Monica Conyers is a former Detroit City Council member.

Finally, with regard to Count V, the complaint alleged that respondent made several misrepresentations to the JTC. For example, respondent told the JTC that he had irrevocably terminated his relationship with Mott on October 31, 2012, although he actually continued his affair with Mott into November 2012. Respondent also told the JTC that he did not take any action on the *Tillman* case in November 2012, but he actually signed an order for reduction of bond in that month. In addition, respondent told the JTC that he did not know of any familial relationship between Tillman and Mott, but he did, in fact, know that they were relatives.[8]

Also on March 12, 2013, the JTC filed a request for the appointment of a master. Three days later, on March 15, 2013, this Court appointed the Honorable Charles A. Nelson, a former circuit judge in Jackson County, as the master, and hearings began on May 20, 2013, and concluded on May 29, 2013. On June 23, 2013, the master filed his findings of fact and conclusions of law with the JTC.

With regard to Count I, the master found that respondent should have disqualified himself from the *King* case as soon as he started a relationship with Mott and that "[f]or McCree to claim in sworn testimony during these proceedings that it was an OVERSIGHT or it didn'[t] DAWN on him that he should recuse himself is not credible.

---

[8] The complaint also alleged that "[t]he sexual acts between Respondent and Mott took place at various locations, including Respondent's judicial chambers"; "[o]n numerous occasions, Respondent escorted Mott into the courthouse through the building's back entrance, reserved for judges, court employees and members of the Wayne County Sheriff's Department"; "[o]n numerous occasions between May and mid-November of 2012, Respondent permitted Mott to remain in his judicial chambers while he was on the bench adjudicating his criminal docket"; and "Respondent assisted Mott in bringing her cell phone into his courtroom, in violation of a 'no cell phones' security policy of the Frank Murphy Hall of Justice."

In short he lied to the JTC." Respondent intentionally used his judicial position to advance his own interests by holding on to the *King* case in order to keep Mott interested in him. According to the master, "He had a hot young lady who was in his words 'eye candy' and a way to keep her interested was to keep her case and be of assistance in the collection of money."[9] Respondent also continuously engaged in ex parte communications with Mott about the case, which led her to believe that she could influence his judicial decisions. "Mott was providing input, without objection by McCree, as to how King should be dealt with," and this "social relationship gave Mott the belief that she was able to influence his judicial duties."

With regard to Count II, the master found that respondent lied to the prosecutor's office when he told them that Mott was stalking him and trying to extort money from him and that he had recused himself from the *King* case when he found out that a child of Mott's had interacted with one of his children.[10] "It is clear that he was improperly seeking to get the prosecutor and her office involved with alleged crimes that were not existent."[11]

---

[9] The defendant in the *King* case owed Mott about $15,000 in child support, and the master found that "the Examiner's theory that some of [respondent's] motivation in having looked after this case and transferring it to a judge of his choice so it would ensure payment of the support and, thus, take off some of the financial pressure that was building for McCree in looking after two families is, by a preponderance, true" as respondent had "advanced money to Mott possibly as much as $6,000."

[10] Respondent also told the prosecutor's office that there was no way that he could have gotten Mott pregnant because he was the "king of latex" and that "Wade was being played."

[11] Although the JTC found that respondent failed to tell the Wayne County Prosecuting Attorney that Mott had been a complaining witness in a case before him and that he

7

With regard to Count III, the master found that when respondent signed the order reducing Tillman's bond, he was just "confirming in the order what had already been done by [Judge Kevin F.] Robbins." However, the master further concluded:

> [Respondent and Mott] were communicating with texts. He was advising what had to be done when the order was signed and how they would get Tillman out of jail.

> The main import of the matter to me is that he again had a case in which Mott had an interest. He was ethically not to be involved and should not have been signing any orders pertaining to the case. McCree's actions were beyond an appearance of impropriety - they were in violation of the ethical standards.

With regard to Count IV, the master found that although many of the text messages that respondent sent while he was on the bench were inappropriate, they were "used in a private context and when used there was no reason to believe that the statements would become public"[12] and "[t]he fact that he may have sent some messages

---

falsely told the investigators that he had immediately recused himself from the case once he realized the conflict, the JTC did not otherwise address Count II. We agree with the master that respondent's claims regarding stalking and extortion are not credible given the communications between respondent and Mott during this period. For example, on November 6, 2012, which according to respondent was during the period that Mott was stalking and extorting him, Mott sent the following text message to McCree: "being held in ur arms this afternoon meant so much to me[.]" In addition, although there is evidence of numerous communications between respondent and Mott during this period, none of the communications in any way suggest that Mott was stalking or extorting respondent. For instance, none of the messages refers to Mott's alleged demand for $10,000 in order to keep their affair a secret and obtain an abortion.

[12] This finding seems to be inconsistent with the master's earlier finding that "[o]f all people who should have known how allegedly private matters (the photo to the deputy) can get into the public domain it would be McCree."

from the bench (as in Tillman) does not mean that he was not performing as a judge." Therefore, the master concluded that

> [t]here is no showing that the sending of the texts in any way interfered with his duties as a judge. I do not believe that this count rises to the level of judicial misconduct.[13]

Finally, with regard to Count V, the master found that respondent did not falsely tell the JTC that he had irrevocably terminated his relationship with Mott on October 31, 2012, because "there is no indication that a sexual relationship continued after that date."[14] And although respondent lied to the JTC about not knowing that Mott and

---

[13] Although the JTC, for reasons not known, did not address Count IV, we feel compelled to note that we respectfully disagree with the master's conclusion that respondent's transmission of numerous text messages to Mott while he was on the bench that contained inappropriate and derogatory references to defendants, litigants, and witnesses appearing before him did not constitute judicial misconduct. Canon 2 of the Code of Judicial Conduct provides, in pertinent part:

> A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

> B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

It can fairly be said that at least several of respondent's text messages to Mott did not "promote public confidence in the integrity and impartiality of the judiciary" and did not treat the subjects of those messages with "courtesy and respect."

[14] To the contrary, we find that the evidence *does* indicate that respondent lied to the JTC about irrevocably terminating his relationship with Mott on October 31, 2012, because

9

Tillman were relatives and not taking any action on the *Tillman* case, this "does not appear to be a material misrepresentation as the Examiner had all of the texts and had an accurate picture when the answer was filed."[15]  Therefore, the master concluded that "these allegations are not such as to warrant action by the JTC."  In conclusion, the master stated:

> In final summary there is Shame in the McCree game: shame to the good name of McCree and shame brought upon the judiciary of the State of Michigan.[16]

---

there is evidence of communications between respondent and Mott after October 31, 2010, that indicate that they were still romantically involved.  For example, on November 6, 2012, Mott sent the following text message to McCree, "being held in ur arms this afternoon meant so much to me" and, on November 8, 2012, respondent sent the following text message to Mott, "I'll C U 2morrow, & WE'LL 'HAVE FUN":-)"  We note that this finding is consistent with the JTC's finding that "Respondent's relationship with Mott began on May 21, 2012, and lasted approximately through mid-November, 2012."

[15] Contrary to the master's conclusion, whether the JTC had sufficient evidence before it to know that respondent was lying when he said that he did not know that Mott and Tillman were relatives and that he did not take any action on the *Tillman* case is irrelevant to whether respondent committed judicial misconduct when he lied to the JTC. Lying to the JTC is judicial misconduct regardless of whether the JTC knows that you are lying or not.

[16] The master made the following additional findings of fact: (1) respondent and Mott had sexual relations in respondent's judicial chambers; (2) "Mott was allowed on a number of occasions to use the judicial parking lot and to use the judges' entry door"; (3) "McCree assisted Mott in bringing a cell phone into court so that she could communicate with him while King's case was reviewed" and "[t]his was accomplished by Mott putting her cell phone in McCree's truck, him bringing it into the court-house and then McCree putting it into an envelope so that a deputy could deliver it to Mott in the courtroom"; (4) Mott told McCree that she was pregnant with his child; (5) McCree told Mott that he would divorce his wife if Mott obtained an abortion; and (6) Mott told McCree that she would obtain an abortion if he divorced his wife.  Finally, the master noted:

The JTC then held a hearing on August 5, 2013, and issued its decision and recommendation for discipline on September 10, 2013. With regard to Count I, the JTC found that respondent had a sexual affair with Mott, who was a complaining witness in a case before him, and that respondent regularly engaged in ex parte communications with Mott regarding the case, even while he was sitting on the bench. For example, respondent and Mott exchanged the following text messages regarding the case:

> *Mott*: Just keep in mind thur ill be in ur courtroom & need 2 bring in my phone so I can text U what I want done incase he makes payment that morning....... otherwise lock his ass up until he pays 2500 in cash directly 2 me via FOC... u seem 2 always call his case last so ill show up late & we can leave 2gether.

> *Respondent*: Likewise, my truck will B unlocked so U can set anything out of sight N my car. We'll hold the case till U get there, or B sure 2 call Sharon Grier ahead of time so she'll know U (the 'C.P.')[17] will B N the courtroom. I figured if [he] hasn't come current by his courtdate, he gets jail 2 pay. If he says he can bring me the $$, I'll put him on a tether till he brings the receipt 2 FOC or do 'double time'.

> *Mott*: Huh??? Teether? 4 how long and how much??

> *   *   *

> *Respondent*: Oooops, did I misspell 'tether'. No, some guys say if they get locked up they can't bring the $$, but if let out they can. So here's the deal: go 2 jail (150 days), release upon payment of $1500. OR, get a tether & bring back w/n 30 days $2500 or serve 9 months! BONUS: pay w/n the 30 days, remove tether

---

> Whether Mott is pregnant or not and who is the baby's father are not of concern, we leave that for the Jerry Springer show. But the events over the October 30 through late November period show a pattern of lies and deception by McCree in his dealings with Mott (not to say that she was an innocent party in those events).

[17] Presumably, "C.P." means "complaining party."

11

\*   \*   \*

*Mott*: He's about 15k behind... 2500 is asking much plus YOU only ordered him 2 pay $50 bucks a month towards arrage . .@ that rate ill be getting CS[18] til Racheal is 26

\*   \*   \*

*Respondent*: OK, the math will be based on his failures since being placed on probation, but if U'r righ the threat of jail will loosen his purse strings!

*Mott*: ok so let's go with what u proposed..... go to jail (150 days), release upon payment of $1500.  OR, get a tether & bring back w/n 30 days $2500 or serve 9 months!  BONUS: pay w/n 30 days, remove tether

*Mott*: He will pay cause they won't let him go 2 jail PLUS u sending him 2 jail would violate his oakland county probation and he gets 10yrs.

*Respondent*: Cool.  I'll run it by the prosecutor.

*Mott*: Make sure she's aware they already let him off by accepting 400 for probation when they told him 1000

\*   \*   \*

*Respondent*: Will do.  That's good 2 know.

Then, on the morning of the review hearing in the *King* case, respondent and Mott exchanged the following text messages:

*Respondent*: I think Ur B.D. is here!!

*Mott*: Did the prosecuter agree wit our deal since she cut him a break .last time??

*Respondent*: Look 4 'my girl' Sharon Grier, she's our prosecutor & she's been 'prepped'.

---

[18] Presumably, "C.S." means "child support."

With regard to Count II, the JTC found that "Respondent reported to Wayne County Prosecuting Attorney Kym Worthy that he was being stalked and extorted by Mott," but "Respondent did not tell Worthy that Mott had been a complainant in a case before him." In addition, "[w]hile Respondent did tell Worthy's investigators that Mott had been a complainant in a case before him, he falsely told the investigators that he immediately recused himself from the case once he realized the conflict."

With regard to Count III, the JTC found that "Respondent's ex parte communications with Mott regarding *People v Tillman* and Respondent's failure to immediately recuse himself from *People v Tillman* upon learning that Tillman was Mott's relative constituted judicial misconduct."

Finally, with regard to Count V,[19] the JTC found that "Respondent engaged in a pervasive pattern of dishonesty that included lying under oath to the Commission and to the Master." For example, respondent testified that it did not "dawn" on him to recuse himself from the *King* case and that his failure to recuse himself was a mere "oversight." However, his e-mails and text messages to Mott reveal otherwise. Indeed, they reveal that respondent knew very early on that what he was doing was wrong and that he would be in serious trouble if anybody found out. For example, in one e-mail he said:

> Second, you are the complaining witness on a case that is before me. Naturally if it got out that we were seeing each other before your B.D.'s case closed, everybody could be in deep shit.

And in a text message, he said:

---

[19] As discussed earlier, the JTC did not address Count IV.

13

Yeah, I'm DEEPLY concerned that certain levels of 'us' remain COMPLETELY UNDETECTED as long as U'r still a litigant N case B4 me & while my nuts R still on a chopping block B4 the JTC.[20]

The JTC finally concluded that "[a] preponderance of the evidence at the formal hearing shows that Respondent breached the standards of judicial conduct . . . ." More specifically, the JTC concluded that respondent engaged in "[m]isconduct in office . . . [and] [c]onduct clearly prejudicial to the administration of justice, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30 and MCR 9.205" and violated MCR 9.104(1), (2), (3), and (4); MCR 2.003; MCR 2.103; MCR 2.114; and MCL 750.423, as well as Canons 1; 2(A), (B), and (C); and 3(A)(1) and (4) and (C) of the Code of Judicial Conduct.

In determining an appropriate sanction, the JTC considered the factors that this Court set forth in *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (2000). Finding that respondent's misconduct implicated six of the seven *Brown* factors and that his "misconduct affected not only the litigants in the *King* and *Tillman* cases, but harmed the integrity of the judicial system as a whole," the JTC recommended that respondent be removed from office and conditionally suspended without pay for six years beginning on January 1, 2015, with the suspension becoming effective only if respondent is reelected

---

[20] The JTC also found that

> [d]uring his relationship with Mott, Respondent used his chambers to engage in sexual intercourse with Mott, permitted Mott to enter the courthouse through an employee entrance without going through security, allowed Mott to remain alone in his chambers while he was on the bench, arranged for Mott to park her vehicle in an area reserved for judges, and brought Mott's cell phone into the courthouse for her, in violation of the court's security policy, so that she could communicate with him while he was on the bench.

to judicial office in November 2014, and that he be ordered to pay costs in the amount of $11,645.17.[21]

## II. STANDARD OF REVIEW

This Court reviews de novo the JTC's factual findings, conclusions of law, and disciplinary recommendations. *In re James,* 492 Mich 553, 560; 821 NW2d 144 (2012); *In re Halloran*, 466 Mich 1219, 1219; 647 NW2d 505 (2002). "Findings of misconduct must be supported by a preponderance of the evidence." *In re Haley*, 476 Mich 180, 189; 720 NW2d 246 (2006). MCR 9.225 provides that "[t]he Supreme Court shall review the record of the proceedings and file a written opinion and judgment, which may accept or reject the recommendations of the commission, or modify the recommendations by imposing a greater, lesser, or entirely different sanction." "Although we review the JTC's recommendations de novo, this Court generally will defer to the JTC's recommendations when they are adequately supported." *Haley*, 476 Mich at 189.

## III. ANALYSIS

## A. FACTUAL FINDINGS

After reviewing the record and hearing oral arguments, we agree with and adopt almost all the factual findings of the JTC. Indeed, most of the JTC's factual findings are

---

[21] MCR 9.205(B) provides:

> In addition to any other sanction imposed, a judge may be ordered to pay the costs, fees, and expenses incurred by the commission in prosecuting the complaint only if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation, or if the judge made misleading statements to the commission, the commission's investigators, the master, or the Supreme Court.

15

not even in dispute. That is, respondent does not dispute that he engaged in a sexual relationship with Mott, who was a complaining witness in a case before him, and that he regularly engaged in ex parte communications with Mott regarding the case.[22] Respondent also does not dispute that when he told the Wayne County Prosecuting Attorney that he was being stalked and extorted by Mott, he did not tell the prosecutor that Mott had been a complainant in a case before him; that he falsely told investigators that he had immediately recused himself from the case once he realized the conflict;[23] that he knew that the defendant in the *Tillman* case was one of Mott's relatives; that he engaged in ex parte communications with Mott about the *Tillman* case; and that he signed an order in the *Tillman* case. Finally, respondent does not dispute that he testified that it did not "dawn" on him to recuse himself from the *King* case and that his failure to recuse himself was a mere "oversight," nor does he dispute that his e-mails and text messages to Mott reveal that he had given thought to his obligation to recuse himself from the case long before he finally did so. Although respondent argues about the significance of some

---

[22] Respondent also does not dispute that he and Mott had sexual intercourse in his judicial chambers, that he permitted Mott to enter the courthouse through an employee entrance without going through security, that he allowed Mott to remain alone in his chambers while he was on the bench, that he arranged for Mott to park her vehicle in an area reserved for judges, and that he brought Mott's cell phone into the courthouse for her, in violation of the court's security policy, so that they could communicate with one another while he was on the bench.

[23] Although in his brief respondent's counsel questions why respondent would lie about when he recused himself from the case, he does not expressly assert that respondent did not tell the investigators that he had immediately recused himself, but instead argues that "[w]hether Judge McCree told the investigators that he 'immediately' recused himself once he realized the conflict is irrelevant . . . ."

16

of these facts and what the appropriate sanction should be in light of them, he does not dispute the above facts.[24]

In addition to the factual findings that we adopt from the JTC, we also find that respondent lied to the prosecutor's office about Mott stalking and extorting him and about why he eventually recused himself in the *King* case. In addition, we find that respondent lied to the JTC about irrevocably terminating his relationship with Mott on October 31, 2012, and about whether he knew that Mott and Tillman were related and whether he took any action in the *Tillman* case. Finally, we find that respondent sent numerous text messages to Mott while he was on the bench that contained inappropriate and derogatory references to defendants, litigants, and witnesses appearing before him.[25]

_____

[24] The JTC also found that (a) "[o]n August 17, 2012, Respondent called the office of Wayne Circuit Judge Susan Borman to check on a landlord-tenant matter Mott had before Judge Borman" and (b) "[o]n October 11, 2012, in violation of MCR 2.114, Respondent prepared and filed a divorce complaint against his wife even though, as he admitted at the formal hearing, he had no intention of going through with the divorce." Respondent argues that "[b]ecause the JTC failed to give Judge McCree notice and an opportunity to respond to allegations concerning the phone call and filing the divorce complaint, they cannot be considered as a basis for discipline." Because we conclude that the JTC's recommended sanction is appropriate even without considering these additional allegations, it is not necessary for us to address whether it was appropriate for the JTC in this matter to consider the uncharged conduct.

[25] Although we agree with the examiner that "[m]any of these text messages are in clear violation of the Michigan Code of Judicial Conduct," we question the examiner's authority to argue before this Court that we should consider this misconduct when the JTC itself did not consider this misconduct. As this Court recently stated in *In re Adams*, 494 Mich 162, 186 n 19; 833 NW2d 897 (2013), "after the JTC has made its findings and its recommendation and the respondent has filed a petition to reject or modify the [JTC's] recommendation, the role of the examiner is to represent the JTC before this Court." See also MCR 9.202(G)(1) ("The commission shall employ an executive director . . . to perform the duties that the commission directs . . . .") and MCR 9.202(G)(2)(a) ("The executive director . . . shall not be present during the deliberations of the commission or

17

Although we believe that the sanctions recommended by the JTC, and adopted by this Court today, would be warranted even without considering these additional findings of fact, we believe that these additional findings provide relevant background and context and demonstrate more fully the nature and magnitude of respondent's misconduct. Furthermore, it is important to emphasize that, unlike the additional findings of fact made by the JTC and discussed in note 24 of this opinion, the additional findings of this Court do not relate to uncharged conduct, and thus respondent does not argue that we cannot consider these additional allegations.

## B. CONCLUSIONS OF LAW

The JTC concluded that respondent engaged in "[m]isconduct in office . . . [and] [c]onduct clearly prejudicial to the administration of justice, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30 and MCR 9.205" and violated MCR 9.104(1), (2), (3), and (4); MCR 2.003; MCR 2.103; MCR 2.114; and MCL 750.423, as well as Canons 1; 2(A), (B), and (C); and 3(A)(1) and (4) and (C) of the Code of Judicial Conduct. After reviewing the record and hearing oral arguments, we agree with and adopt almost all of the JTC's conclusions of law. We agree with the JTC that respondent engaged in misconduct in office and conduct clearly prejudicial to the administration of justice within the meaning of Const 1963, art 6, § 30 and MCR 9.205.

---

participate in any other manner in the decision to file formal charges or to recommend action by the Supreme Court . . . ."). It does not appear that the examiner was "represent[ing] the JTC before this Court" when he argued that we should find that respondent committed misconduct by sending these inappropriate messages to Mott when the JTC itself did not make such a finding.

18

More specifically, we agree that respondent violated MCR 9.104(1) through (4) by engaging in "conduct prejudicial to the proper administration of justice"; "conduct that exposes the legal profession or the court to obloquy, contempt, censure, or reproach"; "conduct that is contrary to justice, ethics, honesty, or good morals"; and "conduct that violates the standards or rules of professional conduct adopted by the Supreme Court[.]" He violated MCR 2.003 by failing to disqualify himself in both the *King* and *Tillman* cases.[26] He violated MCL 750.423 by testifying falsely under oath. He violated Canon 1 by failing to maintain "high standards of conduct so that the integrity and independence of the judiciary may be preserved."[27] He violated Canon 2 by failing to "avoid all impropriety and appearance of impropriety," failing to "promote public confidence in the integrity and impartiality of the judiciary," and allowing a social relationship "to influence judicial conduct or judgment."[28] Finally, we agree that respondent violated

---

[26] The fact that respondent was aware that the defendant in the *Tillman* case was Mott's relative and that he nonetheless engaged in ex parte communications with Mott about the case without recusing himself at the very least created an appearance of impropriety.

[27] Canon 1 provides:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. The provisions of this code should be construed and applied to further those objectives.

[28] Canon 2 provides, in pertinent part:

> A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities

19

Canon 3[29] by failing to "be faithful to the law," engaging in ex parte communications, and failing to "raise the issue of disqualification."[30]

---

A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

C. A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. A judge should not use the prestige of office to advance personal business interests or those of others, but participation in activities allowed in Canon 4 is not a violation of this principle.

[29] Canon 3 provides, in pertinent part:

A Judge Should Perform the Duties of Office Impartially and Diligently

\* \* \*

A. Adjudicative Responsibilities.

(1) A judge should be faithful to the law and maintain professional competence in it. A judge should be unswayed by partisan interests, public clamor, or fear of criticism.

\* \* \*

(4) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . .

## C. SANCTIONS

The purpose of the judicial disciplinary process is to "protect the people from corruption and abuse on the part of those who wield judicial power." *In re Jenkins*, 437 Mich 15, 28; 465 NW2d 317 (1991). "In determining appropriate sanctions, we seek to 'restore and maintain the dignity and impartiality of the judiciary and to protect the public.'" *James*, 492 Mich at 569, quoting *In re Ferrara*, 458 Mich 350, 372; 582 NW2d 817 (1998). We agree with the JTC's assessment of the *Brown* factors-- the considerations that this Court set forth to guide the formation of judicial-discipline recommendations.

The first *Brown* factor states that "misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct[.]" *Brown*, 461 Mich at 1292.[31] We agree with the JTC that respondent engaged in a pattern of misconduct when he maintained a sexual relationship with a complaining witness in a case before him for several months and repeatedly engaged in ex parte communications with her about the case as well as in another case in which her relative was a party. Respondent also

* * *

      C.   Disqualification.   A judge should raise the issue of disqualification whenever the judge has cause to believe that grounds for disqualification may exist under MCR 2.003(B).

---

[30] Given that we do not address the uncharged allegations, see note 24 of this opinion, we do not address the JTC's conclusions of law that pertain to the uncharged allegations, i.e., the JTC's conclusion that respondent violated MCR 2.103 and MCR 2.114.

[31] The *Brown* factors are nonexclusive and are prefaced by the language "everything else being equal[.]" *Brown*, 461 Mich at 1292. Respondent admits that consideration of the first *Brown* factor "indicates more serious misconduct."

engaged in a pattern of texting messages to Mott while he was on the bench that contained inappropriate and derogatory references to defendants, litigants, and witnesses appearing before him. Furthermore, respondent engaged in a practice of violating various security policies of the courthouse by permitting Mott to enter the courthouse through an employee entrance without going through security, allowing Mott to remain alone in his chambers while he was on the bench, arranging for Mott to park her vehicle in an area reserved for judges, and sneaking Mott's cell phone into the courthouse for her.

Finally, as the JTC explained, "the evidence revealed a pattern of dishonesty that included lying under oath to the Commission and to the Master." Respondent lied to the Wayne County Prosecuting Attorney's office about, among other things, when and why he recused himself from the *King* case, and he lied to the JTC and the master about, among other things, why it took him so long to finally recuse himself from the *King* case. As the master explained:

> For McCree to claim in sworn testimony during these proceedings that it was an OVERSIGHT or it didn'[t] DAWN on him that he should recuse himself is not credible. In short he lied to the JTC. . . .[32]

* * *

---

[32] As then Justice YOUNG explained in *In re Noecker*:

> Where a respondent judge readily acknowledges his [or her] shortcomings and is completely honest and forthcoming during the course of the Judicial Tenure Commission investigation, . . . the sanction correspondingly can be less severe. However, where a respondent is not repentant, but engages in deceitful behavior during the course of a Judicial Tenure Commission disciplinary investigation, the sanction must be measurably greater. [*In re Noecker*, 472 Mich 1, 18; 691 NW2d 440 (2005) (YOUNG, J., concurring).]

McCree's problem with the truth is also shown in his contact with law enforcement officials in seeking to have pressure brought to bear on Mott. He told Prosecutor Worthy that a lady with whom he had a relationship was stalking him. There was no indication [made to Worthy] that he and his wife had been engaged in a plan of deception which resulted in continuing contacts between the parties, i.e., calls to secure the abortion, to complete negotiations for the divorce, etc. . . .

He told [investigator] Robert Donaldson that he had recused himself from the King case when he found out that a child of Mott's had interacted with one of his children. A lie.

He told Detective Timothy Matlock that Mott had been stalking him by showing up at Belle Isle. He did not tell [him] that he got in the car and had a conversation with her. He was also a witness to the statement as to the basis for the transfer of the case which was a lie.

Sharon Greer, the prosecutor who worked in McCree's courtroom, was also told the same lie as to the basis for the transfer of the King case.

. . . [T]he events over the October 30 through late November period show a pattern of lies and deception by McCree . . . .

As explained by the JTC, respondent also "falsely told the investigators that he immediately recused himself from the case once he realized the conflict." Respondent's pattern of dishonesty is perhaps best summed up in a text message from Mott to respondent: "guess I shoulda believd u in church when u said u can't go 1 day without lien[.]" For all these reasons, we agree with the JTC that "[t]his factor weighs in favor of a more serious sanction."

The second *Brown* factor states that "misconduct on the bench is usually more serious than the same misconduct off the bench[.]" *Id*.[33] Again, we agree with the JTC that respondent engaged in misconduct on the bench when he had a sexual relationship

---

[33] Respondent "admits that his decision to go forward with the August 16 hearing in *King* was misconduct on the bench."

with a complaining witness in a case before him for several months without recusing himself and by engaging in ex parte communications with her about the case while he was on the bench. We also find that respondent engaged in misconduct on the bench when he transmitted numerous text messages to Mott while he was on the bench that contained inappropriate and derogatory references to defendants, litigants, and witnesses appearing before him. For these reasons, we agree with the JTC that this factor weighs in favor of a more serious sanction.

The third *Brown* factor states that "misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety[.]" *Id*. at 1293. As the JTC explained:

> A neutral and impartial judge is one of the central tenets of our judicial system. Respondent wholly disregarded his duty to remain a detached, impartial figure by engaging in a personal relationship with a litigant in a case before him and by regularly engaging in ex parte discussions regarding the litigant's case, as well as another case in which the litigant had an interest. In addition, Respondent's misrepresentations to the Commission and the Master were prejudicial to the actual administration of justice because they brought deceptive evidence before the Commission and the Master.

We agree with the JTC that respondent's misconduct was prejudicial to the actual administration of justice. Indeed, there is not much, if anything, that is more prejudicial to the actual administration of justice than having a sexual relationship with a complaining witness without recusing oneself, engaging in ex parte communications with this mistress/complaining witness, attempting to use the prosecutor's office as leverage against this now ex-mistress by concocting charges of stalking and extortion against her,

24

and then lying under oath about these matters.[34]  Accordingly, we agree with the JTC that this factor weighs in favor of a more serious sanction.

Similarly, the fourth *Brown* factor states that "misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does[.]" *Id.*[35]  For the reasons already discussed, we agree with the JTC that respondent's misconduct implicated the actual administration of justice.  Therefore, we agree with the JTC that this factor supports the imposition of a more serious sanction.

The fifth *Brown* factor states that "misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated[.]" *Id.*[36]  We agree with the JTC that respondent's misconduct was premeditated or deliberated.  Respondent's sexual affair with Mott lasted for several months, giving respondent more than sufficient time to carefully reflect on his behavior.  In addition, his e-mails and text messages to Mott

---

[34] Respondent argues that his "failure to recuse himself in *King* is 'prejudicial only to the appearance of propriety' " because "King was treated exactly the same as any other felony nonsupport defendant who fails to meet his payment obligations under a delayed sentence agreement . . . ."  No one, of course, can ever know with certainty whether respondent would have treated King in exactly the same manner had he not been engaged in an affair with the mother of King's child.  However, even assuming that respondent's relationship with Mott, including his ex parte communications with her about the case, had no effect on respondent's treatment of King, and thus was somehow not prejudicial to the actual administration of justice, respondent's other misconduct, including lying under oath and falsely accusing Mott of stalking and extorting him, was certainly prejudicial to the actual administration of justice.

[35] Respondent "admits that his failure to recuse himself before the August 16 hearing in *King* implicates the appearance of impropriety."

[36] Respondent admits that his "failure to recuse himself in *King* cannot be considered 'spontaneous.' "

25

demonstrate that he was well aware that what he was doing was unethical, and yet he continued to proceed with the relationship for a considerable period of time without recusing himself from the case in which his mistress was the complaining witness. Accordingly, we agree with the JTC that this factor weighs in favor of a more serious sanction.

The sixth *Brown* factor states that "misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery[.]" *Id.* Lying under oath-- conduct in which respondent engaged-- is certainly "misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy." In addition, failing to recuse oneself from a case in which one's mistress is the complaining witness, as respondent did in this case, is also misconduct that undermines the ability of the justice system "to reach the most just result in such a case." As the JTC explained:

> [T]he ability of the justice system to reach the most just result in a case is undermined when one party has an intimate relationship with the judge and continually engages in ex parte communications regarding that party's case while the other party is required to follow the rules and procedures governing the admission of evidence and the making of arguments to the court.

Therefore, we agree with the JTC that this factor weighs in favor of a more serious sanction.

Finally, the seventh *Brown* factor states that "misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not

26

disparage the integrity of the system on the basis of a class of citizenship." *Id.* We agree with the JTC that there is no evidence that respondent did anything to "disparage the integrity of the system on the basis of a class of citizenship" and that this factor does not weigh in favor of a more serious sanction.

Finding that six of the *Brown* factors weigh in favor of a more serious sanction, and that "Respondent's misconduct affected not only the litigants in the *King* and *Tillman* cases, but harmed the integrity of the judicial system as a whole," the JTC concluded that removing respondent from office and conditionally suspending him without pay for six years beginning on January 1, 2015, with the suspension becoming effective only if respondent is reelected to judicial office in November 2014, would be a sufficient sanction.[37] We agree. We believe that this sanction is necessary in order to sufficiently redress the harm done to the integrity and reputation of the judiciary.

---

[37] Respondent agrees "that discipline is warranted," and he concedes that four of the *Brown* factors weigh in favor of a more serious sanction. However, he argues that this Court should merely "suspend[] him for the duration of his interim suspension." For the reasons discussed throughout this opinion, we do not believe that such a suspension, which would amount to a little over a one-year suspension, would sufficiently address the harm that respondent has done to the integrity and reputation of the judiciary. Respondent argues that his misconduct is analogous to Judge Susan R. Chrzanowski's misconduct and that Judge Chrzanowski was only suspended for 1 year and was given credit for 6 months of her 17-month interim suspension. See *In re Chrzanowski*, 465 Mich 468, 489; 636 NW2d 758 (2001). However, respondent fails to acknowledge that his misconduct was far more extensive than Judge Chrzanowski's misconduct. Judge Chrzanowski appointed an attorney with whom she was having an affair to represent indigent defendants, presided over those cases without disclosing this relationship, and initially made false statements to the police who were investigating the death of this attorney's wife. Although there are some similarities between Judge Chrzanowski's and respondent's misconduct, respondent did far more than have an affair with an interested person in a case pending before him and then initially lie about it. He also engaged in numerous ex parte communications, violated various security policies of the courthouse,

Just last term, this Court held that lying under oath " 'is entirely incompatible with judicial office and warrants removal.' " *In re Adams*, 494 Mich 162, 184-185; 833 NW2d 897 (2013), quoting *In re Justin*, 490 Mich 394, 419; 809 NW2d 126 (2012).[38] In the instant case, as already set forth at length, respondent has done far more than lie under oath. And he committed most of this misconduct while being investigated by the JTC for *other* misconduct for which he has since been sanctioned. As explained by the master:

> [Respondent's] actions in the *King* case show, however, a gross dereliction of judicial duties. His standard of conduct, for his own sexual gratification, has severely damaged the public's view of the judiciary. His irresponsible conduct could only lead to the public having no confidence in the judiciary. He clearly knew he was especially subject to public scrutiny when he had a case pending before the JTC when he began his escapade with Mott. He knew he was on the "chopping block". Yet he continued to engage in activities which would bring even greater scrutiny. He was using his judicial position to advance his own interests by keeping the *King* case. His social relationship gave Mott the belief that she was able to influence his judicial duties. He continuously engaged in *ex* [*parte*] communications with Mott about the case.

> Having already received substantial publicity over his photo sent to the deputy and his remarks to the press regarding same he should have been aware that when the story would break about his relationship with Mott and his handling of the *King* case all of his duplicity would be revealed. That the public's trust in an independent and honorable judiciary would be put to the test.

---

transmitted numerous inappropriate text messages, concocted charges of stalking and extortion, and lied under oath during the JTC proceedings.

[38] As this Court explained in *Adams*, 494 Mich at 186, "[t]his Court has consistently imposed the most severe sanction by removing judges for testifying falsely under oath." See *In re Ryman*, 394 Mich 637, 642-643; 232 NW2d 178 (1975); *In re Loyd*, 424 Mich 514, 516, 535-536; 384 NW2d 9 (1986); *Ferrara*, 458 Mich at 372-373; *In re Noecker*, 472 Mich 1, 12-13; 691 NW2d 440 (2005); *In re Nettles-Nickerson*, 481 Mich 321, 322-323; 750 NW2d 560 (2008); *Justin*, 490 Mich at 396-397; *James*, 492 Mich at 568-570.

That respondent was prepared to engage in this conduct while already undergoing a pending JTC investigation demonstrates the extent of his disregard for the rules of judicial conduct. The people of this state need to know that this Court will not tolerate such disregard for even minimal ethical standards of conduct.

Respondent questions this Court's authority to remove him and conditionally suspend him. This Court's authority to sanction a judge can be found in Const 1963, art 6, §§ 4 and 30. Section 4 provides this Court's general superintending authority over courts:

> The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court. The supreme court shall not have the power to remove a judge.

As this Court has explained:

> "The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur, it will be found able to cope with them. Moreover, if required, the tribunals having authority to exercise it will, by virtue of it, possess the power to invent, frame, and formulate new and additional means, writs, and processes whereby it may be exerted. This power is not limited by forms of procedure or by the writ used for its exercise." [*In re Huff*, 352 Mich 402, 418; 91 NW2d 613 (1958) (citation omitted).]

While "§ 4 does not comprehend the power to permanently enjoin a person from holding juridical office," it does "invest[] this Court with the power to determine that a person is unfit for judicial office and to prevent him from ever exercising judicial power in this

29

state for as long as he is, in our judgment, judicially unfit." *In re Probert*, 411 Mich 210, 231, 233; 308 NW2d 773 (1981).[39]

In addition, Const 1963, art 6, § 30(2) provides, in pertinent part:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to

---

[39] Contrary to respondent's contention, this Court's exercise of the superintending power is not impermissibly "at odds with the right of Michigan voters to choose their judicial officers," but rather upholds the authority of that same people, as they have exercised it in Const 1963, art 6, to invest in this Court the obligation to define standards of judicial conduct and, in coordination with the JTC, impose sanctions for their violation. Just as the people have chosen in their Constitution to establish standards of judicial fitness in terms of legal experience and age maximums, Const 1963, art 6, § 19(2) and (3), "we the people" have chosen to do the same with regard to ethical standards of conduct:

> [T]he elective nature of the judicial office does not relieve this Court of its duty to preserve the integrity of the judiciary, nor does the fact of popular election insulate or immunize a judge from the consequences of his or her misconduct, any more than an elected public official is insulated or immunized by election to office from being held to account for criminal law violations. To be sure, the elective power of the people does include the responsibility to ensure the qualifications of those elected, but they do not bear this responsibility alone. Our Constitution provides that in addition to this responsibility on the part of the electorate, this Court has a separate and distinct duty to uphold the integrity of the judiciary. The people's discharge of their duty through election does not discharge this Court's separate duty to preserve the integrity of the judiciary. Rather, this Court's obligation to maintain the integrity of the judicial branch is indissoluble, and the fact of election does not dispel the harmful effects of judicial misconduct, either within or beyond the boundaries of the election district.

> . . . The people are entitled to a judiciary of the highest integrity, in both appearance and in fact, and this Court always bears the obligation under the constitution adopted by "we the people" to maintain and enforce standards of judicial fitness. [*James*, 492 Mich at 573-574 (MARKMAN, J., concurring in part and dissenting in part).]

30

perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice.

Removal and suspension are sanctions that are expressly listed in § 30(2). Finally,

> [t]he power to suspend is also not limited to cases in which the judge currently holds judicial office. As this Court noted in *Probert* [411 Mich at 224], we possess the authority under the constitution to issue conditional suspensions that "foreclose[] the exercise of the prerogatives inhering in any judicial office to which the disciplined party might have been elected or appointed in the future, the condition being, of course, re-election or appointment to judicial office."

> Such conditional suspensions "disengage the disciplined party from judicial power" only if the person occupies judicial office again during the term of the suspension and do not permanently enjoin the person from holding judicial office. This Court has historically issued conditional suspensions when other sanctions could not fully and adequately address the effect of particular misconduct on the integrity of the judicial system. Although often the greatest danger will pass once "an unfit or incompetent judge is separated from judicial power," this Court should not refuse to consider other sanctions, such as conditional suspensions, when removal alone cannot sufficiently protect the integrity of the judiciary. [*James*, 492 Mich at 576-577 (MARKMAN, J., concurring in part and dissenting in part) (citations omitted).]

In *Probert*, 411 Mich at 222, this Court censured and conditionally suspended Judge Charles V. Probert for five years, "regardless of any possible intervening election or appointment to judicial office." This Court could not remove Judge Probert because he had already left office as the result of his term ending and his defeat in his efforts at reelection. In *Probert*, this Court recognized that we had on three previous occasions "issued conditional suspensions that would have foreclosed the exercise of the prerogatives inhering in any judicial office to which the disciplined party might have been elected or appointed in the future, the condition being, of course, re-election or appointment to judicial office." *Id.* at 223-224. This Court explained that "[t]he effect of

31

those suspensions would have been to disengage the disciplined party from judicial power, but only had that person come to occupy judicial office again during the term of the suspension, and only to the extent that the terms of office and suspension coincided." *Id.* at 224. See also *In re Bennett*, 403 Mich 178, 200; 267 NW2d 914 (1978), in which this Court suspended Judge Earl Warren Bennett for one year without pay "regardless of Judge Bennett's election to another judicial office"; In *In re Del Rio*, 400 Mich 665, 672; 256 NW2d 727 (1977), in which this Court suspended Judge James Del Rio for five years without pay "regardless of respondent's possible intervening re-election to office or election to any other state court"; and *In re Mikesell*, 396 Mich 517, 549; 243 NW2d 86 (1976), in which we suspended Judge William L. Mikesell for $1\frac{1}{2}$ years without pay "regardless of respondent's possible intervening reelection to office or election to any other state court."

We agree with the JTC that a removal, without more, would be an insufficient sanction in this case. If we were to remove respondent and he was reelected in 2014, that would amount to a less than one-year suspension (less than two years including his interim suspension), which we believe is clearly insufficient given the seriousness of his misconduct. This Court has a duty to preserve the integrity of the judiciary. Allowing respondent to serve as a judge after only a one-year suspension will not, in our judgment, adequately preserve the integrity of our state's judiciary. Respondent was just recently publicly censured by this Court and yet continued to engage in misconduct, with his attitude toward the instant JTC investigation perhaps being best summarized by his remark that although "Wade should have recused himself," "no harm no foul." This is strongly suggestive that respondent has not yet learned from his mistakes and that the

32

likelihood of his continuing to commit judicial misconduct is high. Such a cavalier attitude about serious misconduct is disturbing, and respondent's apparent failure to comprehend fully the magnitude of his wrongdoing is equally troublesome.

In summary, respondent had an affair with a complaining witness in a case pending before him, had numerous ex parte communications with that witness about the case, extended to her special treatment concerning the case, and caused her reasonably to believe that she was influencing how he was handling her case. When their relationship subsequently went sour, he sought to employ the prosecuting attorney's office as leverage against her by concocting charges of stalking and extortion. And he lied repeatedly to the JTC and the master while under oath. Respondent is now unfit to serve as a judge, and he will remain unfit to do so one year from now.

## IV. CONCLUSION

The cumulative effect of respondent's misconduct convinces this Court that respondent should not remain in judicial office, and we therefore remove him from that office and conditionally suspend him without pay for six years beginning on January 1, 2015, with the suspension becoming effective only if respondent is reelected to judicial office in November 2014.[40] In addition, because respondent engaged in conduct involving "deceit" or "intentional misrepresentation," pursuant to MCR 9.205(B) we order respondent to pay costs of $11,645.17 to the JTC. The Clerk of the Court is

---

[40] Respondent is no longer a judicial officer and will not be an incumbent at the time of the 2014 3rd Circuit Court election. See *In re Nettles-Nickerson*, 481 Mich 321, 323; 750 NW2d 560 (2008).

33

directed to issue the judgment order forthwith in accordance with this opinion and MCR 7.317(C)(3).

Stephen J. Markman
Robert P. Young, Jr.
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

34

STATE OF MICHIGAN

SUPREME COURT

*In re* WADE H. McCREE, Judge,
Wayne Circuit Court

No. 146826

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I agree with the majority's factual findings and analysis of the factors from *In re Brown*, 461 Mich 1291, 1292-1293 (2000). However, I disagree with the majority's decision to conditionally suspend respondent. Const 1963, art 6, § 30(2) provides four possible sanctions: the Court may censure, suspend with or without salary, retire, or remove a judge. The potential sanctions are listed in order of increasing severity, indicating that the proper discipline should be imposed according to the severity of the respondent judge's conduct. See *In re Probert*, 411 Mich 210, 243; 308 NW2d 773 (1981) (LEVIN, J., dissenting). Under the Constitution's scheme of increasing sanctions, removal is the most serious sanction and is, therefore, "the means by which judges guilty of serious misconduct are divested of office." *Id*. at 241 n 7; see, also, *In re Callanan*, 419 Mich 376, 388-389; 355 NW2d 69 (1984) (explaining that through removal, we completely terminate all of a respondent's ties to his office).

Because respondent's misconduct is of a grave and serious nature, I would impose the most serious sanction—removal. "[I]n view of the egregiousness of [respondent's misconduct], the public attention to it, and the sanctions meted out by . . . this Court," I am "not so cynical about the electoral or appointive process" that I am "concerned about

the respondent's re-entry upon the judicial scene." *Callanan*, 419 Mich at 389. The majority claims that respondent's removal alone would not sufficiently address the seriousness of his conduct; however, the majority overlooks the fact that "[o]ther institutions, notably the press, serve the public's interest in being informed and may be expected to do so . . . ." *Probert*, 411 Mich at 250. In any event, "we always retain the power to determine that a person is unfit for judicial office and to prevent him from ever exercising judicial power in this state for as long as he is, in our judgment, judicially unfit." *In re Jenkins*, 437 Mich 15, 29-30; 465 NW2d 317 (1991) (quotation marks and citation omitted). Accordingly, I would remove respondent from office and assess costs, but would not impose a conditional suspension.

Michael F. Cavanagh