# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

*In re* BRENNAN

Docket No. 157930. Argued June 19, 2019 (Calendar No. 1). Decided June 28, 2019.

The Judicial Tenure Commission filed a formal complaint against 53rd District Court Judge Theresa M. Brennan alleging 17 counts of judicial misconduct related to both her professional conduct and to her conduct during her divorce proceedings. The Supreme Court appointed retired Wayne Circuit Court Judge William J. Giovan to act as master to hear the complaint. With the permission of the commission, its deputy executive director petitioned for the interim suspension of respondent. The Supreme Court denied the petition without prejudice to the commission filing such a petition. 503 Mich 943 (2019). The commission thereafter petitioned for the interim suspension of respondent without pay. The Supreme Court granted the petition for interim suspension but with pay. 503 Mich 952 (2019). After a hearing, the master concluded by a preponderance of the evidence that respondent had committed misconduct in office with respect to all but one count of the second amended complaint. In particular, the master found that respondent had (1) failed to disclose when she presided over *People v Kowalski* (Livingston Circuit Court Case No. 08-17643-FC) that she was involved in a romantic relationship with the principal witness, Detective Sean Furlong, and did not disqualify herself from the case on that basis; (2) failed to immediately disqualify herself from hearing her own divorce case and destroyed evidence even though she knew that her then-estranged husband had filed an ex parte motion to preserve evidence; (3) failed to disclose her relationship with attorney Shari Pollesch or to disqualify herself from hearing cases in which Pollesch or her firm served as counsel for a party; (4) made false statements under oath when deposed in her divorce case; (5) made false statements during certain cases over which she presided regarding her relationships with Furlong and Pollesch; (6) made false statements under oath to the commission; (7) verbally abused attorneys, litigants, witnesses, and employees; (8) directed employees to perform personal tasks for her during work hours; (9) directed employees to perform work for her judicial campaign during work hours; and (10) interrupted two depositions she attended during her divorce case. The commission reviewed the hearing transcript, the exhibits, and the master's report and concluded that the examiner had established by a preponderance of the evidence that respondent had engaged in judicial misconduct and conduct prejudicial to the administration of justice, including failing to disclose relevant facts regarding her relationship with the lead detective in a criminal case over which she presided, failing to disclose her relationship with an attorney representing a litigant in a case over which she presided, failing to immediately recuse herself from hearing her own divorce case, tampering with evidence in her own divorce case, and lying under oath. The commission recommended that respondent be removed from judicial office and that she be ordered to pay costs, fees, and expenses

under MCR 9.205(B) because of her intentional misrepresentations and misleading statements to the commission. Respondent petitioned the Supreme Court, requesting that the Court reject the commission's recommendation.

In a unanimous memorandum opinion, the Supreme Court *held*:

The commission's findings of fact were supported by the record, and its conclusions of law and analysis, under *In re Brown*, 461 Mich 1291 (1999), of the appropriate sanctions were correct. The cumulative effect of respondent's misconduct required her removal from office and imposition of a conditional six-year suspension. The more serious sanction was warranted because six of the seven *Brown* factors weighed in favor of a more serious sanction; the most severe sanction was particularly warranted because respondent made false statements under oath, tampered with evidence in her divorce proceeding, and failed to disclose the extent of her relationship with Furlong during the *Kowalski* trial. Defendant's argument that the participating members of the commission should have disqualified themselves was without merit. Respondent was ordered to pay costs, fees, and expenses under MCR 9.205(B) in light of the intentional misrepresentations and misleading statements she made in her written responses to the commission and during her testimony at the public hearing.

Respondent ordered removed from her current office and suspended from holding judicial office for six years; commission ordered to submit an itemized bill of costs, fees, and expenses incurred in prosecuting the complaint.

Justice CLEMENT, joined by Justice CAVANAGH, concurring, agreed with the majority's factual findings, conclusion of misconduct, and decision to remove respondent from office, but wrote separately to express her concern regarding the Court's authority under Const 1963, art 6, § 30(2) to impose both a removal and a conditional suspension on respondent. Although the Court was bound on this issue by *In re McCree*, 495 Mich 51 (2014), which held that the Supreme Court had authority to impose both a removal and a conditional suspension on a respondent judge, *McCree* relied on distinguishable caselaw and contained troubling constitutional analysis. Justice CLEMENT joined the majority opinion in full because respondent did not seek to overrule *In re McCree* and did not provide a basis for distinguishing the case.

©2019 State of Michigan

<table>
<tr><td><h1>OPINION</h1></td><td>Chief Justice:<br>Bridget M. McCormack<br><br>Chief Justice Pro Tem:<br>David F. Viviano</td><td>Justices:<br>Stephen J. Markman<br>Brian K. Zahra<br>Richard H. Bernstein<br>Elizabeth T. Clement<br>Megan K. Cavanagh</td></tr>
</table>

FILED June 28, 2019

STATE OF MICHIGAN

SUPREME COURT

*In re* THERESA M. BRENNAN,
Judge 53rd District Court

No. 157930

BEFORE THE JUDICIAL TENURE
COMMISSION

BEFORE THE ENTIRE BENCH

MEMORANDUM OPINION.

On June 19, 2019, the Court heard oral argument concerning the findings and recommendation of the Judicial Tenure Commission in this matter. The commission's Decision and Recommendation for Discipline is attached as an exhibit to this opinion.

This Court has conducted a de novo review of the commission's findings of fact, conclusions of law, and recommendations for discipline.[1] Having done so, we adopt in part the recommendations made by the commission. Effective immediately, we order that respondent, 53rd District Court Judge Theresa M. Brennan, be removed from office. In

---

[1] See *In re Morrow*, 496 Mich 291, 298; 854 NW2d 89 (2014).

addition, we impose a six-year conditional suspension without pay effective on the date of this decision. Should respondent be elected or appointed to judicial office during that time, respondent "will nevertheless be debarred from exercising the power and prerogatives of the office until at least the expiration of the suspension."[2] Our order of discipline is based on the following misconduct alleged in the second amended complaint:

(1) Respondent failed to disclose the extent of her relationship with Detective Sean Furlong, a witness in *People v Kowalski*, Case No. 08-17643-FC, to the parties in that case (Counts I and V);

(2) Respondent failed to disclose the extent of her relationship with attorney Shari Pollesch and Pollesch's law firm in several cases over which respondent presided (Count II);

(3) Respondent failed to immediately disqualify herself from her own divorce proceeding and destroyed evidence in that divorce proceeding even though she knew that her then-estranged husband had filed an ex parte motion for a mutual restraining order regarding the duty to preserve evidence (Counts IV and XVI);

(4) Respondent made false statements (a) during court proceedings over which she presided, (b) to the commission while under oath during these proceedings, and (c) while testifying at her deposition under oath in her divorce proceeding (Counts XIII, XIV, and XVII);

(5) Respondent was persistently impatient, undignified, and discourteous to those appearing before her (Counts IX, X, and XV);

---

[2] *In re Probert*, 411 Mich 210, 237; 308 NW2d 773 (1981).

(6) Respondent required her staff members to perform personal tasks during work hours (Count XI);

(7) Respondent allowed her staff to work on her 2014 judicial campaign during work hours (Count XII); and

(8) Respondent improperly interrupted two depositions that she attended during her divorce proceeding (Count VII).

"The purpose of the judicial disciplinary process is to protect the people from corruption and abuse on the part of those who wield judicial power."[3] When evaluating a recommendation for discipline made by the commission, "[t]his Court gives considerable deference to the [commission's] recommendations for sanctions, but our deference is not a matter of blind faith."[4] "Instead, it is a function of the [commission] adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline."[5] "This Court's overriding duty in the area of judicial discipline proceedings is to treat equivalent cases in an equivalent manner and . . . unequivalent cases in a proportionate manner."[6] "In determining appropriate

---

[3] *In re McCree*, 495 Mich 51, 74; 845 NW2d 458 (2014) (quotation marks and citation omitted).

[4] *In re Simpson*, 500 Mich 533, 558; 902 NW2d 383 (2017) (quotation marks, citation, and brackets omitted).

[5] *Id*. (quotation marks and citations omitted).

[6] *In re Morrow*, 496 Mich 291, 302; 854 NW2d 89 (2014) (quotation marks and citation omitted).

sanctions, we seek to restore and maintain the dignity and impartiality of the judiciary and to protect the public."[7]

In this case, we adopt the commission's findings of fact because our review of the record reveals that they are amply supported. In addition, we agree with the commission's conclusions of law and analysis of the appropriate sanction. Regarding the commission's conclusions of law, we agree that respondent violated Canons 1, 2(A), 2(B), and 7(B)(1)(b) of the Code of Judicial Conduct; committed misconduct under MCR 9.104(1) to (4)[8]; engaged in "misconduct in office" and "conduct clearly prejudicial to the administration of justice" under Const 1963, art 6, § 30(2) and MCR 9.205(B); and violated the standards or rules of professional conduct adopted by the Supreme Court, contrary to MCR 9.104(4). Regarding the commission's disciplinary analysis, we agree with the commission that six of the seven factors articulated in *In re Brown*[9] weigh in favor of a more serious sanction, and we conclude that the sanction we have imposed in this case is proportional to sanctions imposed in other judicial-misconduct cases.[10] We are particularly persuaded that these most severe sanctions are necessary because of respondent's misconduct in making false statements under oath, in tampering with evidence in her divorce proceedings, and in

---

[7] *McCree*, 495 Mich at 74 (quotation marks and citation omitted).

[8] Respondent has not argued that MCR 9.104, which governs professional disciplinary proceedings before the Attorney Disciplinary Board, is not applicable in this context. Therefore, we need not decide this question. See *Simpson*, 500 Mich at 555 n 26.

[9] *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (1999).

[10] We note that we are imposing a six-year conditional suspension effective on the date of this opinion, instead of having the removal extend through the next judicial term as requested by the commission.

failing to disclose the extent of her relationship with Detective Furlong in *People v Kowalski*.[11]

We have considered respondent's argument that the participating members of the commission should have disqualified themselves. We find respondent's argument to be without merit.

On the basis of the intentional misrepresentations and misleading statements in respondent's written responses to the commission and during her testimony at the public hearing, we find respondent liable under MCR 9.205(B), in an amount subject to review by this Court, for the costs, fees, and expenses incurred by the commission in prosecuting the complaint. We order the commission to submit an itemized bill of costs.

The cumulative effect of respondent's misconduct convinces this Court that respondent should not remain in judicial office. Therefore, we remove respondent from office and conditionally suspend her without pay for a period of six years, with the suspension becoming effective only if respondent regains judicial office during that

---

[11] We are not often confronted with the multifarious acts of misconduct that are present in this case. The individual findings of misconduct range from those warranting the most severe sanction of removal (such as lying under oath) to those that are still unacceptable, but might warrant a lesser sanction (such as respondent's improper demeanor on the bench). But we are not called upon to assess an appropriate sanction for each discrete finding of misconduct. Instead, we must determine the appropriate sanction for all of respondent's misconduct taken as a whole. We note, however, that "[t]his Court has consistently imposed the most severe sanction by removing judges for testifying falsely under oath." *In re Adams*, 494 Mich 162, 186; 833 NW2d 897 (2013) (citing multiple cases). And we have previously found a conditional suspension appropriate when a judge "has not yet learned from his mistakes and that the likelihood of his continuing to commit judicial misconduct is high." *McCree*, 495 Mich at 86.

5

period.[12]  Pursuant to MCR 7.315(C)(3), the Clerk of the Court is directed to issue the order

removing and suspending respondent from office forthwith.

Bridget M. McCormack
Stephen J. Markman
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

---

[12] The concurrence questions this Court's power to suspend a judge beyond her current term of office.  Because no party has raised those issues here, we decline to address those issues in this case.

# EXHIBIT

## STATE OF MICHIGAN

## BEFORE THE JUDICIAL TENURE COMMISSION

COMPLAINT AGAINST:

HON. THERESA M. BRENNAN          Formal Complaint No. 99
53rd District Court
224 N. First Street
Brighton, MI 48116

_____/

## DECISION AND RECOMMENDATION FOR DISCIPLINE

At a session of the Michigan Judicial
Tenure Commission held on April 8,
2019, in the City of Detroit

PRESENT:[1]

Hon. Monte J. Burmeister, Chairperson
Thomas J. Ryan, Esq.,Vice-Chairperson
Hon. Karen Fort Hood, Secretary
Ari Adler
Hon. Jon H. Hulsing
Melissa B. Spickler
Hon. Brian R. Sullivan

### I. Introduction

The Judicial Tenure Commission of the State of Michigan ("Commission")

files this recommendation for discipline against Hon. Theresa M. Brennan

("Respondent"), who at all material times was a judge of the 53rd District Court

("the Court") in the City of Brighton, County of Livingston, State of Michigan.

---

[1] Hon. Pablo Cortes and James Burdick, Esq. have recused themselves from this case and took no part in this Decision and Recommendation for Discipline.

This action is taken pursuant to the authority of the Commission under Article 6, § 30 of the Michigan Constitution of 1963, as amended, and MCR 9.203.

Having reviewed the hearing transcript, the exhibits, and the Master's report, and having considered the oral arguments of counsel, the Commission concludes, as did the Master, that the Examiner has established by a preponderance of the evidence that Respondent committed misconduct, including failing to disclose relevant facts regarding her relationship with a lead detective in a criminal case before her, failing to disclose relevant facts regarding her relationship with an attorney representing a litigant in a case before her, failing to immediately recuse herself from her own divorce case, tampering with evidence in her own divorce case, and lying under oath.

For the reasons set forth herein, the Commission recommends that the Supreme Court remove Respondent from the office of judge of the 53rd District Court on the basis of her judicial misconduct. In addition, the Commission recommends that the Supreme Court order Respondent to pay costs, fees, and expenses in the amount of $35,570.36 pursuant to MCR 9.205(B), based on her intentional misrepresentations and misleading statements made to the Commission.

## II. Procedural Background

On June 12, 2018, the Commission filed a Formal Complaint against Respondent. On July 23, 2018, the Commission filed its First Amended Complaint

2

against Respondent, alleging (1) failure to disclose the extent of her relationship with Detective Sean Furlong, or to disqualify herself, in *People v Kowalski*, (2) failure to disclose the extent of her relationship with Shari Pollesch and Pollesch's law firm in several cases before her, (3) failure to disclose her relationship with Francine Zysk a/k/a Francine Sumner, or to disqualify herself, in Zysk/Sumner's divorce case, (4) failure to disqualify herself from her own divorce case, *Root v Brennan*, (5) appearance of impropriety regarding Sean Furlong, (6) appearance of impropriety regarding Francine Zysk, (7) conduct during depositions in *Root v Brennan*, (8) failure to be faithful to the law in *Brisson v Terlecky*, (9) improper demeanor in *Brisson v Terlecky*, (10) improper demeanor in *Sullivan v Sullivan*, (11) directing staff to conduct Respondent's personal tasks on court time, (12) improper campaign activities, (13) misrepresentations during court proceedings, and (14) misrepresentations to the Commission.

The Michigan Supreme Court appointed Hon. William J. Giovan as Master, to conduct a public hearing on the allegations in the Formal Complaint. The Master held an eight-day public hearing on the First Amended Complaint, commencing October 1, 2018. The Commission filed its Second Amended Complaint on October 29, 2018, deleting Count III regarding failure to disclose or disqualify with respect to Francine Zysk and Count VI regarding an appearance of impropriety with respect to Francine Zysk, and adding claims for persistent

3

discourtesy (Count XV), destruction of evidence (Count XVI), and perjury, false statements, and misrepresentations (Count XVII). Due to the additional charges, the Master held an additional day of testimony on November 19, 2018.

In the Master's Findings of Fact and Conclusions of Law, issued on December 20, 2018, the Master concluded by a preponderance of the evidence that Respondent committed misconduct in office with respect to all but one count in the Second Amended Complaint.[2] The Commission heard objections to the Master's report at a hearing held on March 4, 2019.

## III. Standard of Proof

The standard of proof applicable in judicial disciplinary matters is the preponderance of the evidence standard. *In re Ferrara*, 458 Mich 350, 360; 582 NW2d 817 (1998). The Examiner bears the burden of proving the allegations in the Complaint. MCR 9.211(A). The Commission reviews the master's findings de novo. *In re Chrzanowski*, 465 Mich 468, 480-481; 636 NW2d 758 (2001). Although the Commission is not required to accept to the master's findings of fact,

---

[2] The Master did not address Count VIII, alleging failure to be faithful to the law in *Brisson v Terlecky* and the Examiner did not object to the master's lack of finding with respect to that count. See Examiner's Response to Objections to Master's Report, p 1 n 2. In addition, the Examiner withdrew Counts XVII(b)(i) and XVII(k). The Master did not make a finding with respect to Count XVII(o) and the Examiner indicated that it would not seek a finding on that count. *Id.* Given the record before the Commission, the Commission is not issuing a recommendation with respect to Count VIII, Count XVII(b)(i), Count XVII(k), or Count XVII(o).

it may appropriately recognize and defer to the master's superior ability to observe the witnesses' demeanor and comment on their credibility. Cf. *In re Lloyd*, 424 Mich 514, 535; 384 NW2d 9 (1986).

## IV. Findings of Fact

The Commission adopts the Master's findings of fact, except where specifically noted below. The Commission highlights and supplements the facts found by the Master, as follows:

## Count I

### Failure to Disclose/Disqualify in *People v Kowalski*

In March 2009, *People v Kowalski,* Case No. 08-17643-FC, in which the defendant was charged with first-degree murder, was assigned to Respondent. Michigan State Police Detective Sean Furlong was the co-officer in charge of the case. Detective Furlong investigated the case, took the defendant's confession, and testified at trial. Before the *Kowalski* case was assigned to Respondent, Respondent told her judicial secretary/court recorder Kristi Cox, that she was sure that Mr. Kowalski was guilty based on a conversation she had about the case with Detective Furlong. Nevertheless, Respondent presided over pretrial hearings in the case, ruling that the defendant's confession was admissible and that a defense expert witness was precluded from testifying at trial regarding false confessions. These rulings were affirmed on appeal.

5

The case was scheduled for trial on January 7, 2013. On January 4, 2013, the assistant prosecutor assigned to the case received a letter from attorney Thomas Kizer, alleging inappropriate contacts between Respondent and Detective Furlong, and between Respondent and Detective Furlong's colleague, Detective Christopher Corriveau. At a pretrial conference in Respondent's chambers on January 4, 2013, the assistant prosecutor and defense counsel advised Respondent of the allegations of inappropriate contact. In response to the allegations, Respondent stated that, while she was friends with the two detectives, there was nothing that required her disqualification. Thereafter, Mr. Kowalski moved to disqualify Respondent from the case. Respondent denied the motion, explaining that, while she was friends with Furlong and Corriveau, the friendships did not affect her ability to fairly decide the case. Chief Judge David Reader later affirmed the denial of the motion to disqualify. At no time did Respondent inform the parties that she had told a member of the her staff that Detective Furlong had persuaded her of Mr. Kowalski's guilt before the case was assigned to her, that she had more than 1500 telephone calls of a social nature with Furlong between July 2008 and the beginning of the *Kowalski* trial, that she was on the phone with Furlong for 1-2 hours every month between November 2011 and the start of the *Kowalski* trial, or that she exchanged approximately 400 texts with Furlong from 2010 until the start of the *Kowalski* trial.

6

The Master concluded that Respondent was engaged in a romantic relationship with Furlong before and during the *Kowalski* case. The Master's finding was based, at least in part, on evidence that Furlong kissed Respondent in her chambers in 2007,[3] and evidence that, after the *Kowalski* sentencing, Kristi Cox found Respondent in her office, severely distressed because Furlong had told her that they could no longer be friends. Respondent's distress was so severe that she was unable to take the bench for her afternoon docket. In addition to these incidents, the Master's conclusion was based on evidence that Respondent socialized with Furlong, that she allowed him to use her cottage, that Furlong had been a dinner guest at her home, and that Respondent's husband sometimes gave Furlong his University of Michigan football season tickets at Respondent's urging, as well as evidence of the number of telephone calls and texts between Respondent and Furlong.

The Commission finds it unnecessary to determine whether the relationship between Respondent and Furlong was a romantic one. Regardless of whether the relationship was "romantic," as found by the Master, or a close friendship, the evidentiary record shows that Respondent was engaged in what was clearly a very close, personal relationship with Furlong during the relevant time period. The relationship required, at a minimum, that Respondent disclose the fact of her close,

---

[3] Respondent contends that the kiss was not consensual.

personal relationship to the parties in the *Kowalski* case so that the parties could determine whether to move for disqualification under MCR 2.003.[4]

## Count II

### Failure to Disclose/Disqualify in Cases Involving Shari Pollesch

Respondent was a friend of attorney Shari Pollesch, a principal in a law firm located in Brighton, Michigan. Respondent considered Ms. Pollesch one of her best friends. Ms. Pollesch testified that she and Respondent were "close friends," that she had known Respondent for about 25 years, and that "[e]verybody knew" that she and Respondent were longtime friends. During their friendship, Respondent and Ms. Pollesch took ski trips together, participated in a book club, took walks during lunch, and were guests at each other's cottages. In addition, Respondent provided her home for Ms. Pollesch's wedding. Ms. Pollesch provided legal services to Respondent's husband's business, to Respondent's husband, personally, and to Respondent's sister. Ms. Pollesch was one of three friends that submitted a statement to the Judicial Tenure Commission on Respondent's behalf in 2009.

---

[4] Citing *Adair v Michigan*, Mich 1027; 709 NW2d 567 (2006) and *In re Haley*, 476 Mich 180, 200; 720 NW2d 246 (2006), Respondent argues in her Objections to Master's Report that the "appearance of impropriety standard" is not applicable to Respondent's duty to disqualify herself because MCR 2.003(C) sets forth specific relationships that require disqualification, none of which fit the facts of this case. Respondent's argument is misplaced because MCR 2.003 was amended in 2009 to add "the appearance of impropriety" as a ground for disqualification.

Ms. Pollesch appeared as counsel in five cases before Respondent in 2014-2016. Attorneys from Ms. Pollesch's firm appeared before respondent in another five cases. Respondent failed to disclose her close, personal relationship with Ms. Pollesch to the parties in the cases in which Ms. Pollesch or another member of her firm appeared as counsel before Respondent. In addition, Respondent denied motions for disqualification in two cases in which disqualification was sought on the basis of a relationship with Ms. Pollesch, in *Scheibner v Scheibner*, Case No. 13-47392-DM and *McFarlane v McFarlane,* Case No. 15-6492-DO.

## Counts IV and XVI

### Failure to Immediately Disqualify in Her Own Divorce Case and Destruction of Evidence

Respondent's former husband, Donald Root, filed a complaint for divorce from Respondent on or about December 2, 2016. The case was assigned to Respondent under a court policy providing that all "DO" cases were to be assigned to her. Chief Judge David Reader advised Respondent of the filing that day. Respondent did not disqualify herself from the case that day or the following business day, Monday, December 5, 2012. On Tuesday, December 6, 2016, Donald Root filed a Motion for Entry of Ex Parte Mutual Restraining Order Regarding the Duty to Preserve Evidence. Chief Judge Reader instructed his secretary, Jeannine Pratt, to call Respondent to emphasize the immediate need for a

9

disqualification order. Ms. Pratt called Respondent and emailed to her a copy of the ex parte motion and a disqualification order. Ms. Pratt advised Respondent that she would pick up the executed order that afternoon. When Ms. Pratt arrived to pick up the executed order, Respondent told her that she would not be signing the order until she spoke to her attorney. The next day, December 7, 2016, Respondent's office informed Judge Reader that the signed disqualification order was in the court mail. The disqualification order was received by the Howell court on December 8, 2016.

Between her learning of the filing of the ex parte motion on December 6, 2016, and the receipt of the disqualification order by the Howell court on December 8, 2016, Respondent attempted to delete information and an email account from her cell phone. On December 8, 2018, Respondent asked her court recorder, Felica Milhouse, to attempt to delete her Hotmail account from the cell phone. Milhouse attempted to delete the account through the phone's settings, but was unsuccessful. Milhouse then conducted a Google search regarding how to delete a Hotmail account from a cell phone. When Milhouse was unable to immediately delete the account, Respondent, who was about to take the bench, directed Milhouse to leave the courtroom and to return to the office after calling the first case to continue to attempt to delete the account. Despite her attempts, Milhouse ultimately was unsuccessful in deleting the account.

10

On or about December 8, 2016, Respondent bought a new cell phone at an AT&T store. At Respondent's request, the AT&T store employee transferred the data from her original phone to her new phone, and had her original phone reset to its factory settings, erasing all data from the original phone. Respondent testified that there were "some glitches" when the contents of the original phone were transferred to the new phone. Respondent then gave the original phone, which now contained no data, to her attorney, without communicating to anyone that she had wiped the data from the original phone. When asked whether she advised anyone that the data from the original phone had been transferred to her new phone, Respondent testified that the issue never came up because the divorce ultimately settled four months later.

On November 2, 2018, the parties stipulated to the following facts:

> When data is copied from the old phone to the new phone, there is not a bit-for-bit copying of the data, and it is likely that some data is not copied. The data that may not be copied includes registry data, metadata, file system data, and database information, all of which are useful to a forensic search of the old phone. Accordingly, it is likely that restoring the old phone to factory settings will result in the loss of forensically useful information, even if the owner of the old phone makes an effort to copy all data from the old phone to the new phone.

> Once the old phone is reset to factory settings it is no longer possible to determine what data was not copied to the new phone. For instance, if a customer tells the tech to copy everything to the new phone except X, and the tech does that and then resets the old phone to factory settings, it is no longer possible to determine what X was,

11

or that X was not copied. Similarly, if a customer deletes some data from the old phone before giving it to the tech, then asks the tech to copy everything that is on the old phone to the new phone, then the old phone is restored to factory settings, it is no longer possible to determine what the customer deleted from the old phone prior to requesting that data be copied to the new phone.

Given these facts, it is more likely than not that Respondent's conduct constituted tampering with evidence, in violation of MCL 750.483a(5)(a).

## Counts XIII, XIV, and XVII

## Misrepresentations, False Statements, and Perjury

The Master described Respondent's willingness to give false testimony under oath as "breathtaking." The Commission agrees that the evidence shows that Respondent made misrepresentations and false statements with a frequency and intent to deceive that is completely at odds with her position as an officer of the court. While, except where noted, the Commission adopts the Examiner's "Appendix 2 - False Statements," as accurate, as did the Master, it emphasizes the following false and material misrepresentations made by Respondent:

A. False Statements Under Oath at Deposition

Respondent made false statements under oath while testifying at her deposition in her divorce case. On January 16, 2017, Respondent testified during her deposition that when she asked her staff to attempt to delete her email account from her cell phone, she was speaking only "jokingly." Respondent's testimony

12

was false. Respondent's court recorder, Felica Milhouse, denied that Respondent was joking when she asked Milhouse to attempt to delete the email account. Because she did not believe Respondent's request was a joke, Milhouse attempted to delete the account through the phone's settings and then conducted a Google search regarding how to delete the account. When Milhouse's initial attempts at deleting the account were unsuccessful, Respondent directed Milhouse to leave the courtroom after calling the first case and to return to the office to continue her attempts to delete the account. In addition, research attorney Robbin Pott testified that she overheard Respondent asking her judicial secretary and her court reporter how to delete information from a cell phone. Pott also overheard Respondent asking a police officer, who came in to have a warrant signed, what was the best way to destroy a phone. Pott testified that Respondent's continued requests for advice regarding how to delete information from the cell phone convinced Pott that Respondent was not joking. Further, Respondent eventually admitted in her testimony at the formal hearing that she was sincere in her request that Milhouse attempt to delete the email account from the cell phone.

On February 9, 2017, Respondent falsely testified at her deposition that she did not request help with deleting information from her cell phone. The evidence showed that Respondent asked employee Felica Millhouse to help her to delete her email account from the cell phone on December 8, 2016. Respondent testified at

13

her deposition that she did not take any steps to delete information from, or to reset, her cell phone. Contrary to this representation, the evidence showed that Respondent asked an employee of an AT&T store to delete messages from her cell phone on December 8, 2016. Moreover, Respondent acknowledged at the formal hearing that she caused an employee of an AT&T store to transfer all data from the original cell phone to a new cell phone and to then reset the original cell phone to its factory settings, deleting all date from the original phone.

B.    False Statements During Court Proceedings

Respondent minimized her relationship with Detective Furlong during the *Kowalski* case. Respondent's statements during the hearing on the *Kowalski* defendant's motion for disqualification concealed the depth of her relationship with Furlong. Respondent represented on the record that her relationship with Furlong was simply that she was "friends" with him, just as she was friends with the prosecutor or the prosecutor's wife. The extensive evidence presented at the formal hearing regarding the especially close and personal nature of Respondent's relationship with Furlong demonstrates that Respondent's characterization of the relationship was false.

Respondent made another false misrepresentation on the record in *McFarlane v McFarlane,* over which Respondent presided. The *McFarlane* defendant moved to disqualify Respondent on the basis of her relationship with

14

Shari Pollesch. During April 25, 2017 hearing on the motion, Respondent falsely stated on the record that she had learned that Shari Pollesch provided legal representation to her husband only shortly before her divorce complaint was filed in December 2016. This representation was shown to be false by Respondent's own statement on the record in *Parker & Parker v Magyari,* 53rd District Court Case No. 14-4250-GC, on December 16, 2014, that her "best friend," i.e, Shari Pollesch, provided legal representation to her husband. (Exhibit 2-43). In addition, Respondent's now former husband, Daniel Root, testified that Shari Pollesch began providing legal representation to his business in June 2011 and that he and Pollesch terminated the legal representation when he filed for divorce from Respondent, in December 2016. Root testified that he was "very confident" that Respondent knew that Shari Pollesch represented him.

C.    Material Misrepresentations to the Commission

Respondent made material, false statements, under oath, to the Commission during these proceedings. Respondent made a false and material misrepresentation to the Commission regarding when she learned that Shari Pollesch provided legal representation to her former husband, Daniel Root. Respondent represented to the Commission, under oath, that she learned of Pollesch's representation of Root only shortly before the complaint in her divorce case was filed, in December 2016. This representation was shown to be false by Respondent's own statement on the record

15

in *Parker & Parker v Magyari,* 53rd District Court Case No. 14-4250-GC, on December 16, 2014, that her "best friend," i.e, Shari Pollesch, provided legal representation to her husband. (Exhibit 2-43). In addition, Daniel Root testified that he was "very confident" that Respondent knew that Shari Pollesch represented him.

Respondent represented to the Commission, under oath, in both a written response and during testimony at the formal hearing, that she rarely handled warrant requests while on the bench, and that she routinely took officers to her office to sign warrants. Respondent's statements were contradicted by testimony from Kristi Cox that, if a police officer came in for a search warrant when Respondent was on the bench, Respondent would stop the proceedings and handle the search warrant in the courtroom. Felica Milhouse also testified that Respondent normally handled warrants from the bench if an officer came into the courtroom while court was in session. Cox testified that if Detective Furlong came to the courtroom for a search warrant, however, Respondent would declare a recess, take Detective Furlong back to her office, and close the door.

Respondent represented to the Commission that she did not text Detective Furlong during the *Kowalski* trial. This representation was shown to be false by telephone records showing that Respondent did, in fact, text Detective Furlong during the trial. See Exhibit I-24.

Respondent made a false and material misrepresentation to the Commission that she never allowed campaign work to be done during work hours. The testimony of Kristi Cox and Jessica Sharpe, discussed above, that Respondent worked with them on campaign activities during work hours demonstrated that Respondent knew that her statements to the Commission were false.

## Counts IX and X

## Improper Demeanor

While the Commission does not adopt the Master's finding that it was "the universal opinion of any witness who testified about the judge's demeanor" that she was consistently abusive to the attorneys, litigants, and witnesses, the Commission does find that a preponderance of the evidence showed that Respondent was persistently impatient, undignified, and discourteous to those appearing before her. Attorneys testifying at the formal hearing indicated that Respondent was routinely disrespectful to attorneys and litigants, and described Respondent's demeanor on the bench as "appalling" and "abusive." One of the attorneys testified that Respondent "would routinely interrupt and basically prevent you from presenting your case to her," and that "[s]he never had the information she needed to make her best decision. I don't think she cared." In *Sullivan v Sullivan,* unpublished per curiam opinion of the Court of Appeals, issued May 17, 218 (Docket Nos. 330543, 334273), a divorce case over which Respondent

presided, the Court of Appeals determined that Respondent's hostility toward counsel was such that "[t]he appearance of justice would be better served if the case is remanded to a different judge."

## Count XI

### Directing Employees to Perform Respondent's Personal Tasks

The Commission adopts the Master's finding that Respondent committed misconduct by requiring her staff members to perform personal tasks during work hours, noting that "[w]hatever may be the correct standard of what a judge can properly ask of an employee, Judge Brennan went far beyond it." The evidence showed that Respondent required her staff to perform personal tasks during work hours, such as taking her car to the dealership, refueling her car, paying her bills, waiting at Respondent's house for cable television to be installed, and staining the deck of Respondent's home.[5]

## Count XII

### Improper Campaign Activities

The Master concluded that Respondent engaged in misconduct by allowing her staff to work on her 2014 judicial campaign during work hours. Both Kristi Cox and Jessica Sharpe testified that, on one occasion, they assisted Respondent

---

[5] While Respondent paid her law clerk/magistrate, Jessica Yakel Sharpe, for staining the deck, the work was partially done while Sharpe was also being paid by the county.

18

with her campaign by responding to questionnaires from news outlets during work hours. Specifically, Kristi Cox testified that, while some of the work was done in the break room:[6]

> . . . it was kind of a joke that we used that we were on break, quote/unquote, and we'd kind of laugh about it and we'd go in there. But it wasn't a 15-minute break. It would be an hour and a half or so while we struggled with the phrasing we were going to use.

A thumb drive containing documents Cox worked on for the 2014 campaign, showing that the documents were modified during work hours, was admitted into evidence at the formal hearing (Exhibit 11-1). Sharpe's and Cox's testimony that Respondent was in the room, performing the campaign work along with them, showed that Respondent was aware that her staff members were performing the campaign task during work hours. On another occasion, Sharpe and Cox, along with Respondent, conducted online research in the courtroom regarding "what kind of swag" would be used at a campaign party. On the basis of Sharpe's and Cox's

---

[6] The Commission does not adopt the master's finding that "the judge went to the corner of the courthouse to use the wi-fi of an adjoining business so that it wouldn't show up on the county system." The Commission finds no evidence in the record supporting a finding that Respondent's purpose in using the wi-fi of an adjoining building was to avoid the computer use showing up on the county system. The attempt to use the wi-fi of an adjoining building also could have been an attempt to comply with Michigan's Campaign Finance Act by not using the county's wi-fi.

testimony, the Commission concludes that Respondent committed misconduct by allowing her staff to perform campaign tasks during work hours.

The Commission is not persuaded by Respondent's argument that she did not violate Michigan's Campaign Finance Act because she was not "a public body or a person acting for a public body." Section 57 of the Campaign Finance Act, MCL 169.257(1), provides, in part, as follows:

> A public body or a person acting for a public body shall not use or authorize the use of funds, personnel, office space, computer hardware or software, property, stationery, postage, vehicles, equipment, supplies, or other public resources to make a contribution or expenditure or provide volunteer personal services that are excluded from the definition of contribution under section 4(3)(a).

MCL 169.211(7) defines a "public body" to include "[a]ny other body that is created by state or local authority or is primarily funded by or through state or local authority, if the body exercises governmental or proprietary authority or performs a governmental or proprietary function." The 53rd District Court was created by state authority, MCL 600.8101. In addition, the district court performs a governmental function authorized by Const 1963, Article VI, §1. Accordingly, the district court is a "public body" within the meaning of the Act.

20

## Count VII

## Conduct During Depositions

Respondent improperly interrupted two depositions that she attended during her divorce case. On January 18, 2017, when Detective Furlong, the deponent, testified that that he and respondent had not exchanged any texts or telephone messages during the *Kowalski* trial, Respondent interjected, "We did once." On March 9, 2017, when deponent Francine Zysk began to answer a question regarding an allegation that Respondent was intoxicated in her office, Respondent interrupted, stating "Okay, you need to stop for a minute." She then added, "You are lying. You're such a liar."

## Respondent's Gender Bias Argument

Respondent argues that the Master's findings should be disregarded because they reflect a gender bias. As one example, Respondent cites the Master's use of the term "hottest" to describe a part of the relationship between Respondent and Detective Furlong. While the Commission believes that the Master's choice of words was unfortunate, the issue whether the relationship was of a romantic nature or simply a close friendship does not change the relevant analysis, as noted above. Under either scenario, Respondent did not take actions she was required to take to fulfill her judicial duties. Having considered Respondent's argument, the

21

Commission concludes that the allegations of gender bias do not change the evidentiary record, which supports the bulk of the Master's findings.

## V. Conclusions of Law

Respondent's conduct breached the standards of judicial conduct, and she is responsible for the following:

a.  Misconduct in office, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30, and MCR 9.505;

b.  Conduct clearly prejudicial to the administration of justice, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30, and MCR 9.205(B);

c.  Failure to establish, maintain, enforce, and personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved, contrary to MCJC, Canon 1;

d.  Irresponsible or improper conduct that erodes public confidence in the judiciary, in violation of MCJC, Canon 2A;

e.  Conduct involving impropriety and appearance of impropriety, contrary to MCJC, Canon 2A;

f.  Failure to respect and observe the law and to conduct oneself at all times in a manner which would enhance the public's confidence in the integrity and impartiality of the judiciary contrary to the Code of Judicial Conduct, Canon 2B;

g.  Failure to prohibit public employees subject to the judge's direction from doing for the judge what the judge is prohibited from doing under this canon, contrary to Canon 7B(1)(b);

22

h.  Conduct that is prejudicial to the proper administration of justice, in violation of MCR 9.104(1);

i.  Conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach, contrary to MCR 9.104(2);

j.  Conduct that is contrary to justice, ethics, honesty or good morals, contrary to MCR 9.104(3); and

k.  Conduct that violates the standards or rules of professional conduct, specifically MRPC 3.3(a)(1), adopted by the Supreme Court, contrary to MCR 9.104(4);

## VI. Disciplinary Analysis

The Commission concludes that Respondent committed judicial misconduct by failing to disclose the relevant facts regarding her relationship with Detective Furlong and Shari Pollesch and/or failing to disqualify herself, failing to immediately disqualify herself from her own divorce case, tampering with evidence in her divorce case, making false and material misrepresentations to the Commission, testifying falsely under oath in her divorce case, making false statements on the record in cases over which she presided, directing staff to perform campaign activities during work hours, directing staff to perform personal tasks for her during work hours, persistently maintaining an improper demeanor on the bench, and improperly interfering in depositions during her divorce case. Based on its finding of misconduct, the Commission recommends that Respondent

23

be removed from judicial office. This recommendation is based on the following evaluation of the factors set forth in *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (1999).

A.    The *Brown* Factors

> **(1)    *Misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct.***

The evidence showed that Respondent engaged in a pattern of deceit. Respondent made material misrepresentations during her deposition in her divorce case and in sworn statements to the Commission. In addition, Respondent engaged in deceitful conduct by failing to disclose material facts regarding her relationships with Detective Furlong and Shari Pollesch to parties appearing before her. Respondent attempted to conceal evidence in her divorce proceeding by deleting all data from the cell phone that she turned over to her attorney. Respondent's dishonesty was not an isolated incident, but pervaded her conduct both on and off the bench.

In *In re Gorcyca*, 500 Mich 588, 637; 902 NW2d 828 (2017), the Court noted "[t]he fact that a statement may be incorrect does not, by itself, render the statement 'false' within the context of a legal proceeding." The *Gorcyca* decision involved a judge's representation regarding the meaning of a gesture she made with her finger. The representation at issue in *Gorcyca* was isolated and finite in

24

nature. By contrast, the record in the instant case reveals a series of misrepresentations that appear to have been made intentionally as part of a pattern of deceit.

In addition to a pattern of deceit, the evidence showed a pattern of Respondent abusing staff, attorneys, and litigants. The first *Brown* factor weighs heavily in favor of a more serious sanction.

**(2)** ***Misconduct on the bench is usually more serious than the same misconduct off the bench.***

The evidence showed that Respondent engaged in misconduct on the bench. Respondent's failure to disclose the facts of her relationships with Detective Sean Furlong and attorney Shari Pollesch to the parties appearing before her was misconduct on the bench. In addition, Respondent repeatedly mistreated attorneys and litigants appearing before her. The Commission concurs with the Examiner's contention that, while Respondent's failure to promptly disqualify her self from her own divorce proceeding was not misconduct that occurred on the bench, "it is so closely related to her judicial duties as to be inseparable from on-bench conduct." The second *Brown* factor weighs heavily in favor of a more serious sanction.

**(3)** *Misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety.*

"[T]here is not much, if anything, that is more prejudicial to the actual administration of justice than testifying falsely under oath." *In re Adams,* 494 Mich 162, 182; 833 NW2d 897 (2013). Again, the evidence showed that Respondent lied under oath during her divorce proceeding and in sworn statements to the Commission. In addition, Respondent's failure to disclose her relationship with Detective Furlong, including the fact that she told a staff member that Furlong had convinced her of the *Kowalski* defendant's guilt, prevented the parties from addressing any bias earlier in the case. Similarly, Respondent's failure to disclose her personal relationship with Shari Pollesch to parties appearing before her denied the parties the opportunity to challenge her ability to be impartial. The third *Brown* factor weighs in favor of a more serious sanction.

**(4)** *Misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does.*

As discussed above, Respondent's misconduct implicated the actual administration of justice and, therefore, weighs in favor of a more serious sanction.

**(5)** *Misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated.*

In many cases, Respondent's misconduct was premeditated and deliberate rather than spontaneous. Respondent's attempts to tamper with evidence in her divorce case did not occur spontaneously but took place over a period of days. While, after learning of the motion to preserve evidence, Respondent initially asked her staff to attempt to delete an email account from her cell phone, her staff was ultimately unsuccessful in doing so. Respondent eventually succeeded in having all data deleted from the cell phone, and transferred to a new phone, before giving the original phone, which contained no data, to her attorney. As the parties stipulated on November 2, 2018, it is likely that some data was lost during the transfer. From the time she was made aware of her husband's motion to preserve evidence to the time she asked the AT&T store employee to delete all date from the original telephone, Respondent had time to reflect on her actions.

Further, Respondent's attempts to mislead the Commission do not appear to have been made spontaneously. Almost certainly, Respondent would have given herself time to reflect on her written responses before submitting them to the Commission. Therefore, it cannot be said that these misrepresentations were made spontaneously. While it is not known whether Respondent's false testimony during her divorce deposition and her false statements on the record in cases over

27

which she presided were spontaneous or deliberate, it is likely that Respondent had time to consider her statements and knew that they were false when made.

Respondent's failure to disclose her personal relationships with Sean Furlong and Shari Pollesch also appears to have been deliberate. Respondent had the time and opportunity to consider disclosing the relevant information but repeatedly failed to do so. The fifth *Brown* factor weighs heavily in favor of a more serious sanction.

> **(6)** ***Misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery.***

Respondent failed to disqualify herself from presiding over a murder trial despite having a close, personal relationship with Detective Furlong, and despite having told a staff member before she was assigned to the case that she believed the defendant to be guilty based on a conversation she had with Detective Furlong. Respondent's failure to disclose her close, personal relationships with Detective Furlong and Shari Pollesch undermined the parties' ability to discover or challenge any bias or partiality.

Respondent caused information to be deleted from her cell phone after learning that her husband had filed a motion for preservation of evidence in her divorce case. While Respondent's divorce case ultimately settled, Respondent's

28

destruction of potential evidence in the divorce case with knowledge that a motion for preservation of evidence was pending is a stunning example of misconduct that undermined the ability of the justice system to discover the truth of what occurred in a controversy.

Respondent's false and misleading statements made under oath in her divorce proceeding and in these disciplinary proceedings undermined the ability of the justice system to discover the truth of what occurred. The sixth *Brown* factor weighs heavily in favor of a more serious sanction.

> **(7)** ***Misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.***

The evidence does not show that Respondent's actions caused the unequal application of justice on the basis of a class of citizenship. Accordingly, this factor does not weigh in favor of a more severe sanction.

In sum, our consideration of the totality of all seven *Brown* factors weighs in support of the imposition of a more severe sanction.

In addition to the *Brown* factors, the Michigan Supreme Court has consistently concluded that "dishonest or selfish conduct warrants greater discipline than conduct lacking such characteristics." *In re Morrow,* 496 Mich 291, 302-303; 854 NW2d 89 (2014). Further, in *In re Adams,* 494 Mich 162, 833

29

NW2d 897 (2013), the Court reasoned that a sanction may be less severe where a respondent acknowledges his or her misconduct and is truthful throughout the disciplinary proceedings, but "where a respondent is not repentant, but engages in deceitful behavior during the course of a Judicial Tenure Commission disciplinary investigation, the sanction must be measurably greater." (Citing *In re Noecker*, 472 Mich 1, 18; 691 NW2d 440 (2005) (Young, J., concurring)). This principle further supports our conclusion that Respondent's dishonest conduct warrants a more severe sanction where the record shows that Respondent has failed to take responsibility for her misconduct and has attempted to minimize, and to provide false explanations for, her conduct throughout these proceedings.

B.    The Basis for the Level of Discipline and Proportionality

The primary concern in determining an appropriate sanction is to "restore and maintain the dignity and impartiality of the judiciary and protect the public." *In re Ferrara*, 458 Mich 350, 372, 582 NW2d 817 (1998). In determining an appropriate sanction in this matter, the Commission is mindful of the Michigan Supreme Court's call for "proportionality" based on comparable conduct. Based on the facts, the Commission believes that removal from office is an appropriate and proportional sanction for Respondent's misconduct.

The Court has consistently concluded that lying under oath warrants removal from office. See *In re Ryman*, 394 Mich 637, 642–643; 232 NW2d 178 (1975); *In*

*re Loyd*, 424 Mich 514, 516, 535–536; 384 NW2d 9 (1986); *In re Ferrara*, 458 Mich 350, 372–373; 582 NW2d 817 (1998); *In re Noecker*, 472 Mich 1, 3, 12–13; 691 NW2d 440 (2005); *In re Nettles–Nickerson*, 481 Mich 321, 322; 750 NW2d 560 (2008); *In re Justin*, 490 Mich 394, 396–397; 809 NW2d 126 (2012); *In re James*, 492 Mich 553, 568–570; 821 NW2d 144 (2012). In *In re Adams*, 494 Mich 162, 173; 833 NW2d 897 (2013), the respondent signed her attorney's name to a pleading without permission and then filed the pleading in the respondent's divorce case. In addition, the respondent lied under oath in her divorce proceedings and made misrepresentations to the Commission during its investigation. *Id.* at 171, 175. While the Commission recommended that the respondent be suspended without pay for 180 days and be ordered to pay costs, the Court "[did] not believe that such a sanction would sufficiently address the harm done to the integrity of the judiciary." *Id.* at 184. Rather, the Court concluded that "because testifying falsely under oath is 'antithetical to the role of a Judge who is sworn to uphold the law and seek the truth,' (citation omitted), and also because respondent has not demonstrated any apparent remorse for her misconduct and continues to deny responsibility for her actions, we believe that the only proportionate sanction is to remove respondent from office." *Id.* at 186-187.

The Court's statements in *Adams* leave little doubt that removal from office is the appropriate sanction in this case. In addition to other misconduct,

Respondent made intentional and false representations, under oath, during her divorce deposition and during the Commission's investigation and proceedings. Dishonesty in these circumstances erodes the public's confidence in the judiciary, *In re Noecker,* 472 Mich 1, 13; 691 NW2d 440 (2005), and renders a judge a judge "unfit to sit in judgment of others," *In re Justin,* 490 Mich 394, 424; 809 NW2d 126 (2012). Further, Respondent has continued to deny and to minimize her misconduct throughout these proceedings.[7] The Commission therefore concludes that Respondent's misconduct warrants removal from office.

## VII. Assessment of Costs, Fees, and Expenses

As noted, the Commission finds that Respondent made intentional misrepresentations and misleading statements to the Commission in her written responses to the Commission and during her testimony at the public hearing. Accordingly, the Commission requests that Respondent be ordered to pay the costs, fees, and expenses incurred by the Commission in prosecuting the complaint. See MCR 9.205(B). The Examiner has submitted an affidavit showing costs, fees, and expenses incurred by the Commission in the amount of $35,570.36. Therefore, the Commission requests an assessment of costs, fees, and expenses in the total amount of $35,570.36.

---

[7] Indeed, Respondent argues in her objections to the Master's report that "every finding by the Master is demonstrably wrong."

32

## VIII. Conclusion and Recommendation

The Commission concludes that Respondent committed misconduct in office by, among other actions, failing to disclose the facts of her relationships with Detective Furlong and Shari Pollesch when warranted, by failing to immediately disqualify herself from her own divorce case, by tampering with evidence in her divorce case, and by making intentionally false and misleading statements on the record in cases over which she presided and during her divorce deposition. In addition, Respondent committed judicial misconduct by making intentional misrepresentations or misleading statements to the Commission in her written responses to the Commission and in her testimony at the public hearing. On the basis of her judicial misconduct, the Commission recommends that Respondent be removed from office and that the removal extend through the next judicial term. In addition, on the basis of the Commission's findings that Respondent made intentional misrepresentations or misleading statements to the Commission and to the Master, the Commission recommends that Respondent be ordered to pay an assessment of costs, fees, and expenses in the total amount $35,570.36.

## JUDICIAL TENURE COMMISSION

HON. MONTE J. BURMEISTER
Chairperson

THOMAS J. RYAN, ESQ.
Vice-Chairperson

HON. KAREN FORT HOOD
Secretary

ARI ADLER

HON. JON H. HULSING

HON. BRIAN R. SULLVAN

MELISSA B. SPICKLER

34

STATE OF MICHIGAN

SUPREME COURT

*In re* THERESA M. BRENNAN,
Judge 53rd District Court

No. 157930

BEFORE THE JUDICIAL TENURE
COMMISSION

---

CLEMENT, J. (*concurring*).

I agree with the majority's factual findings, conclusion of misconduct, and decision to remove respondent, Theresa M. Brennan, from office. I write separately to express my concerns regarding this Court's authority to also impose a conditional suspension upon respondent.

Under Const 1963, art 6, § 30(2), this Court may "censure, suspend with or without salary, retire or remove a judge" for misconduct in office. These potential sanctions escalate in severity, leading to the ultimate sanction wherein the respondent is completely divorced from judicial office: removal. Given the arrangement of § 30(2) as an escalating list of sanction options, I question whether § 30(2) was intended to grant this Court the power to impose *both* a removal *and* a conditional suspension upon a respondent. See *In re McCree*, 495 Mich 51, 88-89; 845 NW2d 458 (2014) (CAVANAGH, J., concurring in part and dissenting in part).[1]

---

[1] To the extent that the additional imposition of suspension on a removed judge is designed to impose continuing consequences on that respondent, I submit that the Attorney Grievance Commission holds authority and discretion to impose such consequences by determining whether discipline such as the suspension or revocation of a respondent's law license is warranted.

That being said, I concede that this challenge appears to be foreclosed by this Court's decision in *In re McCree*. There, this Court removed the respondent from his then-current office and imposed a conditional suspension. *Id*. at 56 (opinion of the Court). It also expressly rejected the respondent's argument that this Court lacked the constitutional authority to impose such a sanction. *Id*. at 82-86. In reaching this conclusion, this Court relied on its earlier decision in *In re Probert*, 411 Mich 210, 224; 308 NW2d 773 (1981), wherein this Court held that it was empowered to impose a conditional suspension upon a nonincumbent respondent because "it is immaterial to a [conditional] suspension . . . whether or not the disciplined party holds judicial office when the suspension is imposed." *In re Probert* did not identify the source of its authority to impose a conditional suspension; it merely stated that "we have on at least three occasions issued conditional suspensions . . . ." *Id*. at 223-224. Those other occasions include *In re Bennett*, 403 Mich 178, 200; 267 NW2d 914 (1978); *In re Del Rio*, 400 Mich 665, 672; 256 NW2d 727 (1977); and *In re Mikesell*, 396 Mich 517, 549; 243 NW2d 86 (1976), wherein this Court imposed suspensions on the respondent judges and indicated that the suspensions would apply regardless of the respondents' election or appointment to other judicial offices. In each of these cases, the suspensions occurred during the respondent's current term of office and precluded judicial service if the respondent obtained another judicial seat during the term of the suspension. As stated, although those cases all involved active judges, this Court found that the fact that the respondent in *In re Probert* had already left office was "immaterial" to its authority to impose a conditional suspension without further discussion of its constitutional authority to do so. *In re Probert*, 411 Mich at 224. In *In re McCree*, 495 Mich at 56, this Court again expanded its suspension power by applying it to an active

2

judge (unlike in *In re Probert*), whom the Court also removed (unlike in *In re Bennett*, *In re Del Rio*, *In re Mikesell*, and *In re Probert*). While I concede that this Court is bound by *In re McCree*'s determination that this Court has the authority to impose both a removal and a conditional suspension on a respondent judge, I am troubled by the constitutional analysis applied in *McCree* and its reliance on distinguishable caselaw to arrive at that determination. Given that respondent does not seek to have *McCree* overruled or provide any basis to distinguish *McCree*, I concur in the result of the majority's decision.

Elizabeth T. Clement
Megan K. Cavanagh